**WESTERN MARYLAND RAILWAY COMPANY**

v.

**UNITED STATES of America.**

Civ. No. 15592.

United States District Court
D. Maryland.

Oct. 23, 1968.

William C. Purnell and Rene J. Gunning, Baltimore, Md., for plaintiff.

Moshe Schuldinger, Donald R. Anderson, Dept. of Justice, and Mitchell Rogovin, Asst. Atty. Gen., Washington, D. C., and Stephen H. Sachs, U. S. Atty., Baltimore, Md., for defendant.

HARVEY, District Judge:

Western Maryland Railway Company (the taxpayer) is suing here to recover various amounts paid to the District Director of Internal Revenue as income taxes for several different taxable years. The taxpayer is a common carrier by rail organized and existing under the laws of Maryland and Pennsylvania, with its principal place of business in Baltimore, Maryland.

In its complaint, the taxpayer asserted a number of different claims in contending that it was entitled to a total recovery of $1,020,898.17 plus interest for overpayments of taxes and deficiencies paid for the taxable years 1952, 1953, 1955 and 1956. Motions for partial summary judgment were filed by both parties, and following a hearing before this Court, an order was entered granting the government's motions with respect to some of the claims asserted in the complaint but denying the government's motions as to other such claims. Such order further denied the taxpayer's motions for partial summary judgment.

The case then proceeded to trial on the following three separate and unrelated issues:

1. Whether the taxpayer is entitled to a deduction from gross income in 1952 on account of the cost of grading allegedly retired upon the removal of a second main track along various sections of its line in the loss year 1954 (the grading deduction claim);

2. Whether the taxpayer is entitled to a carry forward deduction from gross income in 1953 for net operating losses incurred during the years 1950–1953 by its subsidiary, Cumberland and Pennsylvania Railroad Company, with which plaintiff merged on September 1, 1953 (the loss carry-over claim); and

3. Whether the taxpayer is entitled to a deduction from gross income in 1955

and 1956 on account of certain sums allegedly paid as rental to the City of Baltimore under a 30-year lease entered into between the taxpayer and the City (the rent deduction claim).

Separate claims for refund have heretofore been filed with the District Director of Internal Revenue at Baltimore, Maryland. Following denial of all three such claims, the taxpayer timely filed suit in this Court. As the facts relating to each of these claims are somewhat different, they will be discussed separately under the three sub-headings that follow.[1]

### 1. The Grading Deduction Claim.

 The taxpayer maintains its records and files its income tax returns on the accrual method of accounting and on a calendar year basis. During the years involved in this case, the taxpayer employed the retirement system of accounting for its properties. Under that system, depreciation is not charged off annually. Instead, when an asset is retired or replaced, its full initial book value is removed from the capital account and this sum, diminished by any net salvage proceeds, is then charged to current expense. Boston and Main R. R. v. Commissioner, 206 F.2d 617, 619 (1st Cir. 1953).[2]

The taxpayer contends that it is entitled to a deduction in the year 1954 for the cost of certain grading of two seg-

[1.] The parties have agreed that if it is determined that the taxpayer is entitled to recover any amount under any of its three separate claims, the parties will jointly compute the amount of such recovery in accordance with the rulings made in this opinion and submit the amount to the Court for its approval. If the parties are unable to agree as to any such amount, the matter will be presented to the Court for determination at a subsequent hearing.

[2.] In the *Boston and Maine* case, the Court more fully described the retirement system of accounting as follows, 206 F.2d at page 619:

"Under the retirement system of accounting, however, there are no annual depreciation charges as such, and hence

no annual adjustments are made in the book values of the various assets. Only upon the ultimate retirement or replacement with betterments of any particular item of property or equipment is any change made in the investment account; and on that occasion, the full initial book value of the asset (i. e. usually the original cost) is taken out of the capital account, and this sum, diminished by the net salvage proceeds, is then charged to current expense (or in certain cases directly to profit or loss). Meanwhile, any repairs or minor replacements made during the life of the property are charged directly to current expense and are never reflected in the capital account."

ments of its railroad line.[3] The two segments involved in this part of taxpayer's claim extend between Walbrook Junction, Maryland, and Emery Grove, Maryland, for the first and between George's Creek Junction, Maryland, and Deal, Pennsylvania, for the second. Each of these two sections of the line was operated as a double track until 1954. In that year Centralized Traffic Control was installed on various portions of the railroad pursuant to proper authorization by the taxpayer's board of directors. Centralized Traffic Control is an electrical signal system by virtue of which the movement of trains can be directed by remote control from various locations along a railroad system.

Following installation of the new system, one track was retired from various two track portions of the line. The rails, the ties and the ballast were taken up, and the taxpayer claimed and was allowed retirement deductions for these assets for the year 1954. No similar deduction was initially claimed for the cost of the grading of these particular segments of track. However, the taxpayer later filed a claim for refund, contending that it should have been allowed as an additional retirement deduction a portion of its investment in grading.

The theory advanced by the taxpayer is that in 1954 when the second main track was taken up from various sections of the line, the grading associated with such track was permanently retired at the same time as the track, because such grading no longer served its original purpose. The taxpayer theorizes that since safety standards require a minimum of thirteen feet between track centers to provide safe clearance for the passage of trains over the double track, the useful life of thirteen feet of the total grading was retired or abandoned when the second main track was taken up. The taxpayer asserts that grading is property used in its trade or business and that a retirement deduction should be allowed under the provisions of § 167 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 167.[4] In the alternative, it is claimed that the circumstances here support a loss deduction under § 165 of the Code, 26 U.S.C.A. § 165.[5]

As applied to railroad construction, grading is the physical change of the ground surface to prepare the ground for the reception of ballast, ties and track. It consists of both cuts and fills. The grading work necessary for taxpayer's main line between Walbrook Junction and Emery Grove was done during the period 1859–1873, while grading on the other sections involved here was done during the period 1910–1912.

The first question to be determined here under § 167 is whether grading per se is a depreciable asset. The government contends that as a matter of law grading like land is a nondepreciable asset which cannot be retired. It is argued that not only does grading not wear out or become exhausted in time, but that in fact it appreciates with age and becomes more valuable to the taxpayer. At the trial, no attempt was made by the taxpayer to establish a useful life for its grading, some of which was completed almost one hundred years ago.

---

3. Although the proper year for the deduction is 1954, refund is claimed for the calendar year 1952 since the effect of such deduction will be to increase the taxpayer's net operating loss deduction carried back to that year.

4. § 167(a) provides as follows:
 "§ 167. *Depreciation*
 (a) *General rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or
(2) of property held for the production of income."

5. § 165(a) provides as follows:
 "§ 165. *Losses*
 (a) *General rule*—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."

■ It has been recognized by the government, however, that grading directly associated with the construction of buildings and paved roadways is a part of the construction cost of such buildings and roadways and should be included in the depreciable base for these assets. Rev.Rul. 65–265, 1965–2 C.B. 52. In Richmond Belt Railway Company v. Commissioner of Internal Revenue, 13 B.T.A. 1291 (1928), it was held that under the facts there present railroad grading was depreciable. In Commonwealth Natural Gas Corporation v. United States, 266 F.Supp. 298, 302 (E.D.Va. 1966), Judge Butzner noted that there was little authority on the point but concluded that clearing and grading costs in connection with the construction of a pipeline should for depreciation purposes be allocated to the pipeline itself and not to the intangible easement.

Even if this Court were to hold that the particular grading in this case is not a depreciable asset and that the taxpayer is not entitled to a deduction under § 167, it would still be necessary to determine whether a deduction is permissible under § 165. If this Court finds that grading is depreciable, substantially the same question then arises under § 167 as to a taxpayer using the retirement system of accounting as is presented under § 165 as to any taxpayer, namely whether the asset was in fact abandoned or retired in 1954.

■ In the pending case, it is not necessary for this Court to determine whether as a matter of law railroad grading is a depreciable asset.[6] Assuming that such grading is depreciable, the facts developed at the trial of this case conclusively establish that there was no retirement or abandonment by taxpayer of the grading here in question in 1954.[7] Therefore, the taxpayer is not entitled to a deduction either under § 167 or under § 165 of the Code.

Unlike the rails, ties and ballast which were physically removed by the taxpayer when its new system was installed, the underlying grading for both tracks is still in place. The taxpayer urges that there has been a theoretical retirement or abandonment of that portion of the grading attributable to one of the two tracks. It is argued that it would be a useless and impractical requirement if the taxpayer were forced to remove a portion of the grading itself before it would be entitled to deduct the cost of such grading on its books.

Such an argument might have merit if it could be shown that although the asset still existed intact, no further use of such asset was made by a taxpayer. Here the facts indicate otherwise. The grading still in place continues to serve a useful purpose for the conduct of the taxpayer's business operations, even though *all* of it does not serve the same purpose as it did before the one track was removed. The evidence shows that the portion of the roadbed from which the one track has been removed has been used as a road or passageway for automotive vehicles. Such a roadway can be of considerable value in providing access for the maintenance of the one remaining track. According to the testimony, supplies, equipment and machinery used for repairs and maintenance can be located there so that the one track can be more readily used during maintenance operations.

The testimony further disclosed that because of safety considerations, normal traffic along a single track must be

6. At the hearing on the government's motion for partial summary judgment as to the grading deduction claim, this Court rejected, on the basis of the record then before it, the government's contention that grading is a non-depreciable item. The facts developed at the trial and, in particular, the testimony of one of the taxpayer's witnesses that grading has an indefinite life, make this a much closer question.

7. It is likewise not necessary under this view of the case for the Court to decide whether plaintiff has been able to sustain its burden of proving what portion of the existing grading was properly allocable to the one track that was removed.

slowed while maintenance operations are under way. As a result of the existence of the additional grading in question, the taxpayer's single track traffic .can proceed almost at normal speed while repairs are being made, since space now exists for the safe positioning of men and materials.

The removal of snow, particularly in narrow cuts, is now facilitated. Under present conditions, the taxpayer need merely push the snow to that portion of the grading which formerly supported a second track.

With all of the grading still in place, additional drainage protection is afforded for the one remaining track. Indeed, in some places the one remaining track has been re-centered in the middle of the right-of-way. Where the one track has been left in place on the outer edge of a cut, additional protection is now afforded from falling rocks and slides.

█ Such uses are more than incidental and indicate that the taxpayer continues to derive considerable benefit from the ownership of this asset. Not until there has been a complete and permanent retirement or abandonment of the grading would the taxpayer be allowed a deduction under either § 167 or § 165. A mere lessening or decline in the value of an asset to a taxpayer by reason of excess capacity does not create a deductible loss. Reporter Publishing Co. v. Commissioner, 201 F.2d 743, 744 (10th Cir. 1953), cert. den. 345 U.S. 993, 73 S. Ct. 1133, 97 L.Ed. 1401 (1953); New York Sun, Inc. v. Commissioner, 27 T.C. 319, affirmed per curiam, 253 F.2d 487 (2d Cir. 1958).

Neither Burnet v. National Industrial Alcohol Co., 282 U.S. 646, 51 S.Ct. 265, 75 L.Ed. 592 (1931) nor Hummel v. United States, 227 F.Supp. 30 (N.D.Cal.1963), relied upon by the taxpayer, are to the contrary. In the *Burnet* case, a brewer was required by prohibition legislation to give up the use of two floors of a building that had previously been devoted to the manufacture of beer. The Supreme Court held that the taxpayer was entitled to a deduction for the value of the assets no longer used in the taxpayer's business. In *Hummel*, the Internal Revenue Service had disallowed a deduction claimed by taxpayer under § 165 for the rear foundation of a building the construction of which had been stopped after partial completion. In allowing the deduction, the Court noted that in the year the deduction was claimed the taxpayers had begun a dissolution of their corporation and thereafter withdrew completely from the furniture business in which they had previously been engaged. In both of these cases, the facts disclosed a clear and permanent abandonment in their entirety of the use of the assets for which deductions were claimed.

This Court concludes that the facts of the present case disclose merely a lessening or decline in the use of this asset by the taxpayer. The grading in question remains in place available for various railroad uses and is of more than incidental value to the taxpayer. Under such circumstances, deduction for this item will not be allowed.

### 2. The Loss Carry-Over Claim.

In 1944, the taxpayer with the approval of the Interstate Commerce Commission purchased all of the capital stock of the Cumberland and Pennsylvania Railroad Company (Cumberland and Pennsylvania). Cumberland and Pennsylvania thereafter remained a wholly owned subsidiary of the taxpayer until 1953 when the Interstate Commerce Commission issued an order permitting the merger of Cumberland and Pennsylvania into the taxpayer. From 1950 until September 1, 1953, the date of the merger, Cumberland and Pennsylvania sustained operating losses in the amount of $167,-974.86. The taxpayer contends that because of the merger this amount should be carried forward as an operating loss deduction in 1953.

Following the purchase of the capital stock of Cumberland and Pennsylvania by the taxpayer, such subsidiary was operated as a separate corporation. Both

the taxpayer and Cumberland and Pennsylvania filed separate income tax returns, and separate books and records were maintained by each. The officers and directors of the two corporations were the same. Locomotives, freight cars and other equipment were leased by the taxpayer to Cumberland and Pennsylvania. Certain facilities of the two corporations were shared, and operations were generally coordinated.

§ 23(s) of the Internal Revenue Code of 1939 [8] allows a taxpayer a net operating loss deduction as computed in § 122. Under § 122(b) (2) (B),[9] if for any taxable year "the taxpayer" has a net operating loss, such net operating loss shall be a net operating loss carry-over for each of the five succeeding taxable years. The issue here presented is whether the merged corporation was the same "taxpayer" after the merger in 1953 as the "taxpayer" which sustained the losses in the taxable years from 1950 to 1953.

It should be noted that the taxpayer is not contending that it and its subsidiary were one and the same corporate entity nor that its subsidiary was its agent or instrumentality. Separate corporate identity is conceded by both parties. Instead, the taxpayer contends that it and Cumberland and Pennsylvania were the same or substantially the same business and that under Libson Shops, Inc. v. Koehler, 353 U.S. 382, 77 S.Ct. 990, 1 L. Ed.2d 924 (1957), the subsidiary's pre-merger losses could be carried over and applied against the merged corporation's net profits in 1953.

In the *Libson Shops* case, the Supreme Court had occasion to construe §§ 23(s) and 122 of the Internal Revenue Code of 1939, as applied to a corporate merger. There, sixteen separate corporations which operated retail apparel shops were merged into another corporation which had theretofore provided management services for the others. The outstanding stock of all seventeen corporations was owned by the same individuals in the

same proportions. Before the merger each corporation had filed separate income tax returns. After the merger an attempt was made to carry over and deduct the pre-merger net operating losses of three of the original retailing corporations from the post-merger income attributable to the single enterprise that resulted. In holding that such a carry-over and deduction was not permissible, the Supreme Court said the following at pages 386–387, 77 S.Ct. at page 993:

"The requirement of a continuity of business enterprise as applied to this case is in accord with the legislative history of the carry-over and carry-back provisions. Those provisions were enacted to ameliorate the unduly drastic consequences of taxing income strictly on an annual basis. They were designed to permit a taxpayer to set off its lean years against its lush years, and to strike something like an average taxable income computed over a period longer than one year. There is, however, no indication in their legislative history that these provisions were designed to permit the averaging of the pre-merger losses of one business with the post-merger income of some other business which had been operated and taxed separately before the merger. What history there is suggests that Congress primarily was concerned with the fluctuating income of a single business."

Continuing at page 388, 77 S.Ct. at page 994, the Court said the following:

"In the present case, the 16 sales corporations, prior to the merger, chose to file separate income tax returns rather than to pool their income and losses by filing a consolidated return. Petitioner is attempting to carry over the pre-merger losses of three business units which continued to have losses after the merger. Had there been no merger, these businesses would have had no opportunity to carry over their losses. If petitioner is permitted to

---

8. 26 U.S.C.A. (1952 Ed.) § 23(s).

9. 26 U.S.C.A. (1952 Ed.) § 122(b) (2) (B).

take a carry-over, the 16 sales businesses have acquired by merger an opportunity that they elected to forego when they chose not to file a consolidated return."

The government argues that *Libson Shops* establishes a two-pronged test for determining whether an operating loss can be carried forward in circumstances such as those here present. It is contended that the determination must be made first, whether the same or substantially the same business was continued after the merger, and secondly, whether the same business produced any income against which pre-merger losses can be offset. The government does not attempt to establish here that the first part of this test has not been met, but it vigorously asserts that since no separate books and records were kept after the merger, there are no post-merger profits against which pre-merger losses can be deducted and, therefore, the deduction cannot be allowed.[10]

The facts here indicate that when the taxpayer acquired Cumberland and Pennsylvania, it decided for reasons of its own to purchase stock rather than assets. Its decision then was to operate the business of Cumberland and Pennsylvania as a separate corporation. Even after purchasing such capital stock, the taxpayer could have filed the tax returns of both corporations on a consolidated basis, a decision which would have enabled the taxpayer to offset its subsidiary's losses against the parent's profits. See § 141 of the Internal Revenue Code of 1939, as amended. Only after losses were incurred by the subsidiary over a period of several years were the two corporations merged and an attempt made

to offset the gains of one against the losses of the other. As in *Libson Shops,* if the taxpayer is permitted a carry-over under these circumstances, it is acquiring by merger an opportunity which it elected to forego originally when it chose to purchase stock instead of assets, and later when it decided not to file a consolidated return with its subsidiary. If such a result were to be permitted, a corporation would be entitled to secure whatever corporate advantages resulted from maintaining the separate corporate existence of a parent and a subsidiary and filing separate tax returns, and yet still be entitled, after the fact, to gain tax advantages by later effecting a merger of the two businesses.

In *Wisconsin Central Railroad Co. v. United States,* 296 F.2d 750, 155 Ct.Cl. 781 (1961), the Court agreed with the interpretation of *Libson Shops* that the government is pressing here. At page 754, the Court said the following:

"At least one thing is clear from *Libson Shops,* merger alone is not a sufficient basis for allowing the resultant corporation to succeed to its predecessor's tax attributes. The Supreme Court required that tax attributes of a pre-merger corporation could only be utilized to the extent that one could trace that corporation as a unit in the resultant enterprise. Even then the pre-merger corporation's losses could be used only to offset that unit's income or, conversely, the unit's losses could be carried back only to offset the income of its pre-merger form."

In the recent decision of the Third Circuit Court of Appeals in Frank Ix and Sons, Virginia Corp. v. Commissioner,

---

10. This interpretation of *Lisbon Shops* was formalized in Rev.Rul. 59–395, 1959–2 Cum.Bull. 475, 479, as follows:

"Further, the taxpayer has the burden of establishing the correctness of the amount claimed as a net operating loss deduction or unused excess profits credit. Even after a statutory merger or consolidation subject to the 1939 Code, if the records of the resultant corporation are not maintained in such manner as to enable the Internal Revenue Service to make a reasonably conclusive determination as to the part of such deduction or credit allocable to the portion of the business of the resultant corporation conducted with the assets of the merged constituent, the claim will be regarded as having failed for lack of proof and will be disallowed."

375 F.2d 867 (3rd Cir. 1967), the Court, in declining to permit a net operating loss carry-over deduction, said the following at page 871:

"In the present case, as in *Libson Shops,* individuals chose to cast their investment into separate corporate units, each of which was a separate economic entity as well as a separate legal entity, and the assets which produced the income against which earlier losses were sought to be applied were different from the assets which produced the losses. If the separate businesses had not been combined there would have been no right to utilize the net operating loss carry-over from the unprofitable corporation to reduce the taxable income of the profitable corporation."

The taxpayer relies principally on United States v. Northern Railroad, 334 F.2d 936 (1st Cir. 1964). In that case, the taxpayer railroad had two subsidiaries, and the three corporations were operated as one business enterprise which was called the Northern Railroad Line. Consolidated tax returns were filed by the three corporations for the taxable years 1942 through 1945. In 1946, the two subsidiaries did not operate, and the parent corporation filed a separate return in which it sought to carry-over losses sustained by such subsidiaries in 1945. In permitting the net operating loss carry-over deduction, the Court noted that in reality there was but one business that was being operated. Returns had always been filed on a consolidated basis and after the subsidiaries stopped their operations it would have been an artificial distinction to deny the offsetting of losses which had previously always been deducted from operating profits of the single enterprise.

This Court concludes that the Supreme Court's decision in *Libson Shops* requires that before a loss carry-over claim may be maintained under circumstances such as those here present, the taxpayer must show that the same unit which sustained the loss before a merger had profits after the merger against which the earlier losses could be offset. In the present case, it is conceded that no separate books were maintained after the merger. Therefore, the taxpayer cannot establish that assets of the Cumberland and Pennsylvania produced gains after the merger against which such subsidiary's pre-merger losses could be offset. In the absence of such a showing, the carry-over loss deduction sought by the taxpayer may not be taken.

### 3. The Rent Deduction Claim.

In 1926, the taxpayer entered into an agreement with the City of Baltimore to lease for a period of thirty years certain pier facilities located within the City. The taxpayer entered into possession of these facilties on October 15, 1929 and commenced paying an annual rental computed at 6% of the total construction costs.

In October of 1931, the taxpayer advised the City that it had concluded that it had been paying too much rent under the then existing pier lease. The disputed portion of rent involved that part of the construction costs attributable to dredging and filling to prepare foundations for a bulkhead along McComas Street (this work having been referred to by both the City and the taxpayer as the "sand fill item"). This portion of the construction work had been completed before the parties executed the pier lease on December 29, 1926. The lease called for the rent to be computed on the basis of the cost of constructing and laying the pier structures and facilities. It was the taxpayer's position in 1931 that this language referred to construction work to be done after execution of the lease agreement and not to the sand fill work which had been completed before.

A conference was held with City officials, and it was agreed that pending final settlement of the dispute the City would continue to bill the taxpayer for the full amount of the rent due but that the taxpayer would withhold each month the payment of $2,114.31 representing the monthly rental attributable to the

cost of the sand fill work. It was to be understood that such agreement was without prejudice to the rights of either party with reference to this disputed rent claim.

For many years the matter was not pressed by either party, and the City continued to record on its books the unpaid rentals and continued to bill the taxpayer for these amounts. In 1951, discussions were undertaken between the parties with reference to the proposed expansion and improvement of the pier facilities and the renewal of the lease which was to expire on October 15, 1959. Included in such discussions was the City's claim that the disputed rent should be paid in full. These talks continued over a period of several years culminating in a meeting held on February 15, 1955. At that meeting, the taxpayer offered to pay at once the rent attributable to the sand fill item in full and further to pay a rental of $175,000.00 per year for a new 30-year term. This offer was later accepted, and a new lease was executed on April 27, 1955, providing, *inter alia*, for the payment by the taxpayer of $522,250.00 in cash "covering the present value of the balance due the City from the railway for the heretofore disputed sand fill item" and for the payment of an annual rent of $175,000.00 for the use and occupancy by the taxpayer of the Port Covington piers from October 15, 1959 until December 31, 2050.

On its income tax return for the year 1955, the taxpayer deducted as a business expense the sum of $456,243.00 representing rent allocable to the sand fill item for the period from October 15, 1929 to December 31, 1955. The balance of the $522,250.00 was deducted ratably for the years from 1956 through 1959. Upon audit, the Internal Revenue Service disallowed part of the deductions taken for the years 1955 and 1956 and determined that deficiencies were due for those two years. The amounts claimed as deficiencies were thereafter paid by the taxpayer together with interest, and claims for refund to recover the amounts of such deficiencies plus interest were timely filed by the taxpayer.

It is the government's position that one-half of the amount paid by the taxpayer to the City of Baltimore because of the back rent claim represented a capital expenditure made for the purposes of acquiring a new lease and was not a current expense deductible in the year made.[11] The government relies on a memorandum of the discussions between representatives of the parties on February 15, 1955, in which there is a statement that at one point in the negotiations for the new lease the City had indicated that it would accept a rent of $200,000.00 per year plus payment of one-half of the disputed rent. It is argued that since the taxpayer could have entered into an agreement whereby it would have had to pay only one-half of the sand fill claim, the remaining one-half represented the payment of a sum necessary to acquire the new lease and not the payment of a disputed rent claim.

The government's position is seriously weakened by its concession that one-half of the $522,250.00 paid was in fact the payment of past due rent which could be deducted by the taxpayer as a business expense in the year that the payment was made.[12] The entire amount

---

11. It has been held that an expenditure made to acquire leasehold property is a capital investment subject to annual allowances for exhaustion during the period of the lease. King Amusement Co. v. Commissioner, 44 F.2d 709, 710 (6th Cir. 1930), cert. den. 282 U.S. 900, 51 S.Ct. 212, 75 L.Ed. 792 (1931).

12. § 162(a) (3) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 162(a) (3), provides in part as follows:

"(a) *In general.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

 * * * * *

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."

was claimed over the years by the City as rent due from the taxpayer, and the circumstances surrounding the negotiations which resulted in the execution of the new lease do not support the arbitrary assignment of one-half of this sum to some purpose other than the payment of rent.

From the outset the City was asserting a *bona fide* claim substantially justified by the facts. Indeed, the taxpayer for some two years had actually included the sand fill item in its rent payments, pursuant to a legal opinion from its counsel concluding that the cost of the sand fill item was properly includible in the construction costs which were used as a basis for computing the taxpayer's rent.[13] It was only after new counsel took a different view in October of 1931 that the taxpayer began to withhold portions of the rent attributable to the sand fill item.[14]

Between 1931 and 1955, the disputed item was continually accrued by the City on its books as rent. When paid, it was credited in the City accounts to unpaid rental for the pier property. In the 1955 lease, the $522,250.00 that was paid was referred to as the "present value of the balance due the City from the railway for the heretofore disputed sand fill item."

As to the rent deduction claim, the government's case rests in its entirety upon a single paragraph from a memorandum of the discussions held on February 15, 1955 between representatives of the City and of the taxpayer. Such memorandum was prepared by the taxpayer's counsel, and the paragraph in question provides as follows:

"I reminded Mr. Fallin that at the time of our last conversation he had indicated to me that the City would be agreeable to a rental of $200,000.00

per year, plus payment of half of our agreed figure of $570,000.00 for the balance of the existing Port Covington loan. Mr. Fallin confirmed this expressly."

It should be noted, however, that this proposal was not acceptable to the taxpayer. It represented merely one of a number of different positions that the parties took during the negotiations which lasted from 1951 until the lease agreement was finally executed in April of 1955. Indeed, the total amount claimed as back rent at that time was $570,000.00, whereas the final payment accepted was $522,250.00. The government's position assumes that since at one stage of the negotiations the City was willing to accept one-half of the amount of the sand fill claim, the remaining one-half must necessarily have been a capital expenditure. But such assumption ignores the fact that this proposal was never acceptable to the taxpayer because it would have resulted in the payment of an additional $25,000.00 as rental over the life of the new lease.

There is no evidence before the Court to indicate that the decision to pay the sand fill claim substantially in full was made for tax reasons. In fact, Mr. Eugene S. Williams, who handled the 1955 negotiations, testified that the taxpayer accepted the agreement in its final form because it had wanted to pay up the disputed rent claim in full and "clean the whole thing up then" rather than adding parts of it on to rent to be paid in future years.

Somewhat similar facts as are involved here were present in Pritzker Foundation v. United States, 58–1 U.S. T.C. ¶ 9375 (S.D.Ohio 1958). There a landlord had sued the tenant for an accounting and a substantial sum of additional rent. The suit was settled in 1948 and as a part of the settlement the ten-

---

13. In a memorandum dated August 9, 1929, the taxpayer's attorney, Mr. George Cochrane Doub, reviewed the pertinent documents including drafts of the 1926 agreement and concluded that as used in the agreement, "the cost complete of constructing and laying the structures

and facilities" was sufficiently broad to include the sand fill work which was done before the agreement was executed.

14. At this time counsel was Mr. Eugene S. Williams, later President and Chairman of the Board of the taxpayer.

ant paid the landlord a cash sum, the old lease was cancelled, and a new lease was executed between the parties. In upholding the cash payment as a proper income tax deduction by the tenant in 1948, the Court said the following:

"To interpret that the amount in question was paid as a bonus for acquiring the lease is a strained construction and entirely unwarranted by any evidence. There is not a single thing in any of the evidence that indicates the parties ever talked about a bonus being paid for the new lease. Such an idea is pure supposition."

For like reasons, it is concluded that the taxpayer is entitled to deduct the full amount paid on account of the sand fill rent item as a business expense in the years 1955 and 1956 when such payments were made. The plaintiff is therefore entitled to a judgment as to the rent deduction claim.

Accordingly, judgment will be entered for the government as to the grading deduction claim and the loss carry-over claim. Judgment will be entered for the taxpayer as to the rent deduction claim. Counsel should agree on the amount of such judgment and promptly submit an appropriate order, the costs to be equally divided between the parties.