*Decision will be entered under Rule 155.*

SEABOARD COAST LINE RAILROAD COMPANY, SUCCESSOR BY MERGER TO ATLANTIC COAST LINE RAILROAD COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3777–71.     Filed August 22, 1979.

---

George K. Dunham, for the petitioner.
*Donald W. Williamson, Jr., for the respondent.*

TANNENWALD, *Judge:*\* Respondent determined that petitioner Seaboard Coast Line Railroad Co. is liable as successor by merger to Atlantic Coast Line Railroad Co. (hereinafter referred to as ACL) for deficiencies in Federal income tax for the calendar years and in the amounts as follows:

| Year | Deficiency | Year | Deficiency |
|------|-----------|------|-----------|
| 1958 | $96,311.98 | 1960 | $630,831.47 |
| 1959 | 621,908.52 | 1961 | 654,260.35 |

Upon leave of Court granted February 10, 1975, respondent filed an amendment to his answer wherein he claimed increased deficiencies in petitioner's Federal income taxes for the years 1958 through 1960 in the amounts of $9,631.12, $93,947.33, and $135,487.78, respectively, and a decreased deficiency in income tax for 1961 in the amount of $15,989.82. Respondent subsequently abandoned his claim for increased deficiencies (in the case of taxable year 1961, a reduced deficiency) because of erroneous calculations in the amendment to answer, and for purposes of this case relies upon the deficiencies as determined in the statutory notice of deficiency.

Concessions having been made by the parties, the issues remaining for decision are: (1) Whether ACL, in its application of the retirement-replacement-betterment method of account-

---

\* This case was assigned to and heard by Special Trial Judge Joseph N. Ingolia pursuant to Rules 180 through 182, Tax Court Rules of Practice and Procedure. Prior to the preparation of a proposed report and submission thereof to the parties pursuant to Rule 182, the case was reassigned to Judge Theodore Tannenwald, Jr.

ing for rail during the years 1958 through 1961, must use the current fair market value for relay rail rather than average ledger value; and if so, what was the fair market value of the relay rail, and what is the proper method of computing the adjustment to taxable income based on the use of fair market value; and (2) whether ACL is entitled to deductions under section 165 or 167[1] in each of the years 1958 through 1961 in connection with the purported abandonment or retirement of certain railroad grading.

## GENERAL FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner, the Seaboard Coast Line Railroad Co. (Seaboard), a Virginia corporation, maintained its principal place of business in Jacksonville, Fla., at the time of filing its petition herein. Seaboard is the successor by merger to the Atlantic Coast Line Railroad Co. (ACL).

ACL was incorporated under the laws of the State of Virginia on March 14, 1836, as the Richmond & Petersburg Railroad Co., and became the ACL on November 21, 1898. ACL underwent numerous corporate changes throughout the years, culminating with its merger on July 1, 1967, with Seaboard. ACL filed its corporation income tax returns for the years 1958 and 1959 with the District Director of Internal Revenue at Greensboro, N.C. For the years 1960 and 1961, ACL filed its corporation income tax returns with the District Director of Internal Revenue at Jacksonville, Fla.

ACL was, as petitioner now is, a class I common carrier by rail, regulated by the Interstate Commerce Commission. ACL carried freight and passenger traffic in a six-State area extending from Virginia to Florida, and into Alabama. During the years at issue, ACL either owned or operated between 5300 and 5500 miles of main line and branches.

ACL's books of account were maintained in accordance with rules prescribed by the Interstate Commerce Commission. It employed the accrual method of accounting, using a calendar

---

[1]All section references herein are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, unless otherwise specified.

year basis, for both book accounting and income tax accounting purposes.

## Relay Rail Issue

### FINDINGS OF FACT

A railroad's track structure is an asset which is essential to its operation. As applied to ACL, the term "track structure" collectively refers to those assets maintained in the following property accounts prescribed by the Interstate Commerce Commission Uniform System of Accounts for Railroad Companies (49 C.F.R. sec. 1201 (1978) ):

| Account | Property description | Account | Property description |
|---------|----------------------|---------|----------------------|
| 3 | Grading | 10 | Other track materials |
| 8 | Ties | 11 | Ballast |
| 9 | Rail | 12 | Track laying and surfacing |

Over the years, including those at issue, ACL has made additions to and deletions from its track structure. It has also maintained and upgraded the track structure.

Together, these assets comprised the physical structure, exclusive of the land, which supported and guided ACL's trains. In general, these assets served the following functions: Ties are the cross pieces, usually wooden, which directly support and hold the rail on which the trains roll; other track material refers to the variety of miscellaneous metal components, such as rail joints, bolts, tie plates, spikes, and switches, which are used to secure the rails to one another and to the ties as well as for other special purposes; ballast is the crushed rock, gravel, or other granular material which forms a suitable foundation for the ties; grading is the preparation of land, by excavation and embankment, to provide a flat and straight base upon which to put the track structure; and track laying and surfacing refers to the labor expense of installing all of the above.

The track structure is also classified into main lines, branch lines, yard tracks, and switching and industrial sidings. Main lines are further classified as primary main lines and secondary main lines, depending upon volume of traffic over the line. Branch lines are those portions of ACL track which were constructed to provide a link from a particular area, typically a single shipping point or city, to the main line. Yard and switching tracks are those tracks which are used to marshall and

divert trains along ACL's various lines. Industrial tracks are sidings or lead-ins to sidings which serve a specific shipper.

During the years at issue, and at all other times here relevant, ACL utilized the retirement-replacement-betterment method of accounting for the assets comprising its track structure (herein referred to as the RRB method). It used this method both for financial accounting and for income tax purposes.[2]

Under the RRB method of accounting, all elements of ACL's original track structure, including rail, were capitalized when placed in service. These assets were maintained on ACL's books at their initial cost. ACL claimed no deductions for ratable depreciation and maintained no reserve for depreciation of these assets during their useful lives. Rather, recovery of the investment in its track accounts, and in particular its investment in rail, was effectuated in the following manner:

(1) *Retirements.*—When a section of rail was picked up and retired from service without being replaced, the cost of the particular rail as shown in the capital account was charged (debited) to operating expenses. The retired asset was then assigned a salvage value,[3] classified as reusable rail or scrap, and placed in a materials and supplies account at the assigned value. This assigned value for the rail was in turn credited to (and thus reduced) operating expenses.

(2) *Replacements in kind.*—When a section of rail was replaced in kind, the cost of the replacement rail was charged to operating expenses, and the assigned salvage value of the replaced rail was credited to operating expenses. If the rail laid in replacement was new, its cost as new rail was expensed. If the rail laid in replacement was used, the amount expensed was the assigned salvage value of the used rail as carried on ACL's books. For example, if 85-pound rail was replaced by 85-pound rail, the cost of the replacement rail was expensed, and the value assigned to the replaced rail (as reusable rail or as scrap) was credited to operating expenses.

---

[2]In addition to the explanation set forth in the findings of fact herein, the nature and details of this accounting method are further elaborated upon in *United States v. St. Louis-San Francisco Railway Co.*, an unreported case (E.D. Mo. 1975, 35 AFTR2d 75–1317, 75–1 USTC par. 9395), affd. 537 F.2d 312 (8th Cir. 1976). See also *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962, 993–994 (1976), on appeal (6th Cir., June 2, 1978).

[3]Use of the term salvage value in this context is not to be confused with its definition in sec. 1.167(a)–1(c), Income Tax Regs. Rather, its use herein merely denotes the value which is assigned to rail released from the track system.

(3) *Betterments.*—A betterment ordinarily involves a situation where a section of rail is replaced by a new or used rail having a heavier pattern weight.[4] When replacement of a section of rail involved a betterment, the portion of the cost of the replacement rail if new (or the portion of the assigned salvage value of a used replacement rail) attributable to the increased pattern weight was capitalized, the portion of the cost (or assigned value) attributable to the replacement was charged to operating expenses, and the assigned salvage value of the replaced rail was credited to operating expenses. For example, if a section of 85-pound rail was replaced with 115-pound rail, the amount attributable to the extra 30 pounds was capitalized, and the balance, reduced by the assigned salvage value of the 85-pound rail picked up, was currently expensed.

(4) *Additions.*—An addition involves the installation of a new line of track or an extension of an existing track. Under the RRB method of accounting, the full current cost of new rail, or the value assigned to used rail, laid as an addition, is capitalized.

The theory underlying the application of the RRB method to rail is that all rail in the track structure is deemed to be a single asset, and each individual length of rail is a single component of that asset. Reflective of this theory is the concept of ledger value (stated value or ledger cost) of rail. The ledger value of rail is the initial investment, not including labor, required to place the original rail in service (adjusted for any Interstate Commerce Commission valuation orders), plus the cost of rail applied as additions and betterments subsequent to the date the rail was originally placed in service. Ledger value does not include the cost of replacements since those costs are currently expensed. Rail retirements reduce the track account by the cost of the particular rail retired as shown on ACL's books. The average ledger value of rail is the ledger value of the rail, i.e., the total amount shown in the track account, at any given time, divided by the number of tons of rail in place. The average ledger value per gross ton of ACL's rail during 1958 through 1961 was $35.43, $35.37, $35.04, and $34.92, respectively.

---

[4]The pattern weight of a rail is the weight in pounds of a 3-foot length of the rail. Rail is manufactured in 39-foot lengths and various pattern weights. Commonly used pattern weights of rail include: 85-pound, 100-pound, 115-pound, 131-pound, and 132-pound. During the years at issue, the heavier rail generally was used in main lines and lighter rail was generally employed in branch lines, yard tracks, and industrial tracks.

Relay or reusable rail is rail that ACL had released (picked up or recovered) from a portion of its track structure and was in sufficiently good condition to be relaid in another portion of the track structure. Rail which was picked up but was not in sufficiently good condition to be reused was classified as scrap and sold as scrap metal. During the years 1958 through 1961, and for over 20 years prior to 1958, ACL assigned a value of $25 per gross ton to rail released from its track structure as the result of a replacement or retirement. This value was assigned regardless of whether the released rail was classified as scrap or relay rail and was essentially an arbitrary value during the taxable years at issue.

When ACL released rail from its track structure, it debited an asset account (material and supplies) $25 per gross ton for the rail released, and credited operating expenses in an equivalent amount. When the released rail was reapplied (relaid) in the track structure, it was given the assigned value of $25 per gross ton as its "cost" or basis. Upon disposition of scrap rail, generally by sale, the difference between the gross proceeds received from the scrap and its assigned value was either credited against operating expenses (where the proceeds exceeded the assigned value) or debited to operating expenses (where assigned value exceeded the proceeds). This method of accounting was consistent with the financial accounting provisions of the regulations of the Interstate Commerce Commission.

The useful life of rail is affected by a variety of factors. Included among the factors which enter into the life of rail are: the amount of tonnage carried over the rail; the use of steam or diesel locomotives; the introduction of continuous welded rail to replace jointed rail; the use of rail having heavier pattern weights; improvements in the metallurgical characteristics of rail, especially those resulting from the controlled cooling of rail; rail defects, such as shelly rail, corrugations, split rail heads, and milling defects; conditions such as climate, weather, subgrade, gradient, curvature, and train speed; and the degree of maintenance of the track structure.

The most important of these factors is the extent and nature of the impact of trains traveling on the rail. Because rail is not rigid as a train travels on it, it bends and consequently suffers metal fatigue. The rail becomes brittle with excessive metal fatigue, causing the rail to snap. The rate at which rail yields to

metal fatigue increases with the speed and weight of trains traveling on it, and with the density of the traffic. In addition, friction caused by the contact between the train wheels and the rail literally grinds away the rail.[5]

Rail wear on a straight segment of track (a tangent) is ordinarily a less significant cause of rail deterioration than metal fatigue. On curved portions of track, however, rail wear is of considerably more importance, as centrifugal force drives the locomotive wheels into the outside rail. The resultant abrasion of the rail is alleviated somewhat by banking the outside rail on a curve, which distributes the train's weight more evenly between the two rails. But banking cannot equalize the pressure for every combination of train speed and weight, and both the high rails and low rails on curves suffer extensive wear. The damage on curves is compounded because the outside wheels of the train (which being on a fixed axle have farther to travel on a curve) tend to slip ahead of the inside wheels and grind the rail surface in the process. Because of these factors, little (if any) rail which is placed in service on curves is reusable when replaced.

The use of steam locomotives and jointed rail sections also has a significant influence on the life of rail. Considerable damage to jointed rail ends is caused by "end batter," a problem characterized by the jointed ends of rails becoming permanently depressed from the impact of the train wheels.[6] Also, the impact of a steam engine locomotive with unbalanced weights on its drivers causes further damage by leaving dents in the rail. This pounding not only impairs the quality of the ride possible on the rail, but also leaves the rail more susceptible to the formation of cracks. With the introduction of continuous welded rail and the replacement of steam engines by diesel locomotives, the problems arising from such causes were expected to be reduced appreciably. ACL completed its diesel changeover prior to 1958, but had only laid an insignificant amount of continuous welded rail through the year 1961.

---

[5]The result of such wear may be to cause the actual weight of the rail to be 5- to 10-percent less than its pattern weight.

[6]Prior to the introduction of continuous welded rail, the rail sections were joined together by the use of angle bars and bolts, which required drilling holes in the ends of each rail section. In order to prepare the rail for reuse in jointed rail sections (as relay rail), it was frequently necessary to crop the ends of the rail to eliminate end batter. Thus, of rail removed from ACL's track system, approximately 10 percent of its mileage (and weight) was lost on account of "cropping." When welded rail is relaid, however, cropping is not necessary. See also n. 5 *supra*.

Latent defects in the steel itself also limit the useful life of rail. Thus, rails suffer from erosion, end chipping, pitting, and excessive wear from the joint bars, although corrosion and pitting are more a result of time than of use. In addition, rail manufactured after the introduction of the controlled cooling process in 1937 is superior to rail manufactured prior to 1937. This process eliminated numerous incidents of internal structural defects. There were also serious structural design problems resulting in rail failures with 131-pound rail. ACL began to use 131-pound rail in 1943, but due to its experience with this weight of rail, made no new purchases of it after 1950. These rail defect problems unique to 131-pound rail were somewhat alleviated with the introduction of continuous welded rail, because holes were no longer drilled at the rail ends for the rail joint bars.

Rail wear occurs most rapidly on the most heavily traveled lines of a system, and especially on the curved sections of those lines. Because of this, ACL policy was to use its least worn rail on those lines. ACL, therefore, divided its entire track system into two categories, new rail territory and relay rail territory. New rail territory is comprised of those high-speed, heavy-tonnage lines, primarily main lines, on which ACL had virtually all its new rail. During the years at issue, approximately one-third of ACL's track structure constituted new rail territory.

ACL policy was to remove used rail from main line service well before it reached the point of becoming a hazard. This, in turn, allowed the released (relay) rail to be relaid in branch lines, in which a lesser quality rail was acceptable due to less demanding traffic, or as subsequently appears (see p. 864 *infra)* in other main line sections. The track where relay rail was applied constituted the relay rail territory. Relay rail was itself picked up and relaid a second time on the least traveled portions of ACL's track, such as sidings and switchyards. This process is known as cascading.[7] When rail was worn beyond further serviceability, it was picked up and sold as scrap.

In 1943, 100-pound and 85-pound rail were the predominate pattern weights of rail in the ACL system, together comprising about 85 percent of the rail in the main line. The 100-pound rail was acquired during the period 1923 through 1947, while most of

---

[7]In its rail replacement program, ACL, from time to time, installed sections of heavier weight rail to replace rail of lighter weight. Such replacements would initiate the process of cascading.

the 85-pound rail was acquired prior to 1918. By the period from 1958 through 1961, these two pattern weights constituted less than 50 percent of the rail in the ACL main line. The 131-pound rail was first introduced into the ACL system in 1943, and, by the 1958 through 1961 period, such rail and the 85-pound and 100-pound rail constituted all but a small part of the main lines of ACL's track system in approximately equal proportions. After 1950, the 115-pound and 132-pound rail became significant parts of the ACL system. During the years at issue, a substantial percentage of the relay rail laid was laid in ACL's main line. This relay rail was predominately 132-, 131-, and 100-pound rail. In addition, the source of considerable amounts of relay rail during this period were portions of the main line whose second track was being abandoned because of the installation of centralized traffic control, see p. 888 *infra.*

ACL's books and records reflect an inventory of relay rail in its materials and supplies account at the end of each of the years 1957 through 1961 as follows:

| | *Relay rail inventory* | |
|---|---|---|
| *Year* | *Gross tons* | *Book value* |
| 1957 ............ | 8,659.74 | $216,493.34 |
| 1958 ............ | 8,211.58 | 205,289.77 |
| 1959 ............ | 9,109.38 | 228,522.13 |
| 1960 ............ | 11,627.46 | 321,842.29 |
| 1961 ............ | 9,105.12 | 228,112.62 |

During the years 1958 through 1961, ACL picked up reusable (relay) rail from its tracks in the following amounts in gross tons:

| *Year* | *Rail released by new rail replacement* | *Rail released by relay rail replacement* | *Rail released by retirement* | *Total* |
|---|---|---|---|---|
| 1958 | 8,005 | 11,252 | 3,171 | 22,428 |
| 1959 | 7,425 | 12,020 | 4,213 | 23,658 |
| 1960 | 7,871 | 10,090 | 6,303 | 24,264 |
| 1961 | 37 | 7,594 | 9,549 | 17,180 |

ACL claimed the following costs for rail replacements and rail retirements, after reduction by $25 per gross ton for rail released by replacement and retirement, respectively, and credited against operating expense the following proceeds from sales of scrap in excess of $25-per-gross-ton inventory figure:

| Year | Replacement cost | Retirement cost | Credit against operating expense for scrap proceeds |
|---|---|---|---|
| 1958 ........ | $962,995 | $113,400 | $129,245 |
| 1959 ........ | 971,711 | 13,538 | 158,088 |
| 1960 ........ | 893,934 | 34,400 | 20,106 |
| 1961 ........ | 48,897 | 14,052 | 24,189 |

During the years 1958 through 1961, ACL laid relay rail in additions and in betterments in the following amounts:

| Year | Additions (gross tons) | Betterments (gross tons) |
|---|---|---|
| 1958 ........... | 4,669.94 | 3,790 |
| 1959 ........... | 2,429.46 | 3,170 |
| 1960 ........... | 5,649.11 | 2,861 |
| 1961 ........... | 5,401.85 | 2,310 |

The following table demonstrates petitioner's computation of the amounts of relay rail released as the result of new rail replacement and applied by ACL as additions and betterments (all rail figures in gross tons):

| Year | Relay rail released by new rail replacement on basis of pattern weights | Less loss in weight due to wear (5%) | Estimated tons of relay rail released by new rail and available for use | Percent of relay rail released by new rail replacement to total relay rail available | Relay rail released by new rail replacement and laid in addition and betterments |
|---|---|---|---|---|---|
| 1958 | 8,005 | 400 | 7,605 | 25.75% | 1,958 |
| 1959 | 7,425 | 371 | 7,054 | 31.38 | 2,214 |
| 1960 | 7,871 | 394 | 7,477 | 32.44 | 2,425 |
| 1961 | 37 | 2 | 35 | 0.22 | 1 |

During the years 1958 through 1961, ACL laid relay rail in its track system by pattern weights in the following percentages:

| Year | Less than 85 lb. | 85 lb. | 90 lb. | 100 lb. | 112 lb. | 115 lb. | 131–132 lb. | Greater than 132 lb. |
|---|---|---|---|---|---|---|---|---|
| 1958 | 9.50 | 16.05 | 0.04 | 33.47 | 0 | 2.83 | 38.11 | 0 |
| 1959 | 3.13 | 8.76 | 0 | 44.72 | 3.86 | 0.80 | 38.73 | 0 |
| 1960 | 10.20 | 12.35 | 0 | 34.73 | 0 | 2.43 | 40.29 | 0 |
| 1961 | 10.39 | 11.75 | 1.02 | 32.35 | 2.68 | 2.86 | 38.95 | 0 |

A well-established market exists with respect to both new rail and scrap rail. During the period from 1948 through 1961, the gross tons of new rail purchased by ACL,[8] the average price per

---

[8]Rail tonnage figures are often listed in terms of net tons. However, ACL (and Seaboard) maintained its general books of account in terms of gross tons. The conversion of net tons to gross tons is accomplished by dividing the amount of net tons by 1.12. (However, see exhibit 73, in which following relationship is given: net tons = 2000 lbs., gross tons = 2240 lbs.; this suggests that conversion factor in the stipulation is backwards.)

gross ton paid by ACL for the new rail, the gross tons of rail classified as scrap sold by ACL, and the average price per gross ton that ACL received on its sales of scrap were as follows:

| | Purchases of new rail | | Sales of scrap rail | |
|---|---|---|---|---|
| Year | Gross tons | Average price per gross ton | Gross tons | Average price per gross ton |
| 1948 | 38,195.0 | $69.01 | 20,304.30 | $58.21 |
| 1949 | 45,521.0 | 77.28 | 23,030.58 | 36.84 |
| 1950 | 39,488.0 | 81.76 | 30,983.00 | 40.42 |
| 1951 | 23,160.0 | 81.76 | 12,580.00 | 48.76 |
| 1952 | 33,209.0 | 85.68 | 14,356.00 | 45.52 |
| 1953 | 32,432.0 | 98.56 | 18,138.00 | 46.67 |
| 1954 | 20,289.0 | 101.36 | 12,976.00 | 36.70 |
| 1955 | 24,539.3 | 104.94 | 9,397.32 | 43.46 |
| 1956 | 9,902.7 | 109.05 | 10,684.82 | 68.17 |
| 1957 | 9,258.0 | 118.16 | 2,903.57 | 62.76 |
| 1958 | 8,899.1 | 130.48 | 5,094.64 | 50.36 |
| 1959 | 8,895.5 | 130.48 | 5,998.21 | 51.52 |
| 1960 | 8,812.5 | 130.48 | 875.89 | 47.95 |
| 1961 | 42.0 | 130.48 | 1,973.21 | 37.77 |

The new rail prices listed above represent the cost of new rail without taking into account any handling or freight-in cost.

In contrast, the market in relay rail is thin. Railroads, including ACL, typically reuse their less worn rail to maintain their own plant, and sell very little reusable rail. Nonetheless, a small quantity of relay rail does find its way to market, and there are recognized brokers or dealers who are active in this market. The buyers generally consist of small short line railroads, industrial users, construction companies, and mine operators as well as dealers, and their demand for rail is relatively low and inelastic. If the railroads were to offer for sale all of their usable secondhand rail, it could not be absorbed by the market.

During the years at issue, ACL had a policy of not separately purchasing or selling relay rail. However, ACL did purchase small quantities of relay rail during 2 of these years. In 1959, ACL purchased 792 tons of 112-pound relay rail for $75 per ton. In 1961, it purchased 878.3 tons of 112-pound relay rail at $75 per ton and 226.1 tons of 131-pound relay rail at $84.48 per ton.[9]

---

[9] Representative averages of the industry between 1960 and 1971 indicate that the price of relay rail normally ranged between 50 and 60 percent of the price of new rail. Most of these transactions, however, involved rail of relatively light weight. Railroads release only very limited amounts of reusable rail with a pattern weight over 115 pounds for sale; yet among the major railroads, rail of 130 pounds and more comprises over half of the rail relaid.

On the basis of Rev. Proc. 68–46, 1968–2 C.B. 961,[10] respondent, in his notice of deficiency, determined that ACL's use of $25 per gross ton for relay rail in computing its operating expenses under the RRB method of accounting for each of the years 1958 through 1961 was incorrect. In his adjustment, respondent used the fair market value of the relay rail when the rail was released from the track, determined to be $80 per gross ton, and made adjustments to the extent that relay rail was laid in additions and betterments during 1958 through 1961. These adjustments resulted in reducing the corresponding replacement and retirement deductions to which ACL was otherwise entitled in those years by the following amounts:

| Year | Deduction claimed | Amount of downward adjustment per statutory notice | Allowable deductions |
|---|---|---|---|
| 1958 | $947,150 | $465,115 | $482,035 |
| 1959 | 826,161 | 307,970 | 518,191 |
| 1960 | 908,228 | 468,056 | 440,172 |
| 1961 | 38,760 | [11] 424,151 | (385,391) |

The foundation for respondent's downward adjustment is summarized as follows:

| | 1958 | 1959 | 1960 | 1961 |
|---|---|---|---|---|
| Gross tons of relay rail laid in additions | 4,669.64 | 2,429.46 | 5,649.11 | 5,401.85 |
| Gross tons of relay rail laid in betterments | 3,790.00 | 3,170.00 | 2,861.00 | 2,310.00 |
| Gross tons of relay rail capitalized by respondent | 8,459.64 | 5,599.46 | 8,510.11 | 7,711.85 |
| Times respondent's increase in salvage value ($80 less $25) | $55.00 | $55.00 | $55.00 | $55.00 |
| Amount of adjustment in the statutory notice | [1]$465,115.20 | $307,970.30 | $468,056.05 | $424,151.75 |

[1] This amount should have been $465,280.20, the $165 error resulting from the use of 4,666.94 gross tons of additions in the final calculations rather than the correct amount of 4,669.64 set out above.

[10]On Jan. 27, 1966, the National Office of the Internal Revenue Service, in a technical advice memorandum to the District Director at Jacksonville, Fla., addressed itself to the value to be employed for reusable materials recovered in replacements and retirements. In the technical advice, the position was taken that the taxpayer (ACL) should account for reusable rail recovered from retirements, replacements, and betterments by using values which were the lower of actual costs or current fair market values. Subsequently, the Service changed its position on this issue. The amended position was published in Rev. Rul. 67–145, 1967–1 C.B. 54. See also Rev. Proc. 68–46, 1968–2 C.B. 961.

[11]See pp. 885–886 *infra*, where the impact of the reduction which produces a minus figure as an adjustment is discussed.

In the notice of deficiency, respondent made no adjustment with respect to rail picked up and subsequently relaid as a replacement in kind or sold as scrap. He also made no adjustments to the tonnage of relay rail laid by ACL in additions and betterments during 1958 through 1961, as determined by respondent, due to increases or decreases in ACL's relay rail "inventory," i.e., materials and supplies account, during those years.

OPINION

This issue has three components: (a) The proper criterion to be employed in valuing reusable or relay rail (see n. 12 *infra)* utilized by petitioner in its track system, i.e., average ledger value, as contended by petitioner, or fair market value, as contended by respondent (see Rev. Rul. 67–145, 1967–1 C.B. 54; Rev. Proc. 68–46, 1968–2 C.B. 961); (b) assuming the criterion is fair market value, what was that value during the taxable years in question; and (c) the computation of the adjustment based on such fair market value.

### a. *Fair Market Value v. Adjusted Average Ledger Value*

The threshold question, namely, the use of fair market value as the criterion, has been the subject of extensive prior litigation and the issue has uniformly been resolved in favor of the position taken by respondent herein. *Missouri Pacific Railroad Co. v. United States*, 204 Ct. Cl. 837, 497 F.2d 1386, 1399 (1974); *Chicago, Burlington & Quincy R. Co. v. United States*, 197 Ct. Cl. 264, 455 F2d 993, 1005 (1972), revd. on another issue 412 U.S. 401 (1973); *United States v. St. Louis-San Francisco Railway Co.*, 537 F.2d 312, 313–316 (8th Cir. 1976), affg. an unreported case (E.D. Mo. 1975, 35 AFTR2d 75–1317, 75–1 USTC par. 9395); *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962, 993–998 (1976), on appeal (6th Cir., June 2, 1978). Petitioner herein invites us not to follow these cases on the ground that they are distinguishable because of the record now before us or that, in any event, they were incorrectly decided. For the reasons hereinafter set forth, we decline petitioner's invitation. Before proceeding to our analysis, we believe it appropriate to set forth a brief explanation of the factual background of petitioner's treatment of its track system.

During the years at issue, ACL (the predecessor of petitioner

herein) utilized the retirement-replacement-betterment method in determining the proper treatment for both financial accounting and tax purposes of the rails in its track structure (herein referred to as the RRB method). Under this method, ACL's original track system was capitalized as its initial cost. No deductions were claimed for ratable depreciation and no reserve for depreciation was maintained. Rather, the replacement or retirement of a rail was handled in the following fashion: (1) Where a rail was picked up and retired, without replacement, the cost of that particular rail as shown in the capital account, less salvage value, was deducted as a current expense; (2) where a rail was simply replaced in kind, the capital account remained unchanged and the current expense deduction consisted of the cost of replacement (where a new rail was used) or the salvage value of a used rail, otherwise known as "relay rail,"[12] (where the used rail constituted the replacement) less the salvage value of the picked up rail; (3) where the replacement resulted in an addition to or betterment of the system, ACL capitalized the cost attributable to the addition or betterment and the remaining cost, less salvage value of the picked up rail, was expensed.

In computing the various adjustments under the above-mentioned three categories, ACL assigned $25 per gross ton as "salvage value" to the rail released from its track system. Although this figure was originally based on an historical cost formula, it was essentially an arbitrary figure during the taxable years at issue. Petitioner now agrees that the proper figure to be used in respect of additions or betterments (category (3) above)[13] is "average ledger value," a figure arrived at by allocating to the released rail its aliquot portion of the amount shown in ACL's capital account for its rail system. Respondent, in his deficiency notice, utilized the fair market value of the relay rail as salvage value and made adjustments accordingly with respect to relay rail encompassed within category (3) above. By amendment to his answer, respondent

---

[12]Relay rail is the term applied to rail that is released from a track system and is in sufficiently good condition to be relaid in another portion of the system. The system itself generally has several parts—main lines, secondary lines, branch lines, yard tracks, and industrial tracks.

[13]In view of the fact that as subsequently indicated, respondent has limited his adjustments herein to additions or betterments (category (3) above) the adjustments for categories (1) and (2) above continue to rest upon petitioner's use of the $25 assigned value for the latter categories. Consequently, despite the conceptual difficulties involved (see n. 14 and pp. 874 – 875 *infra*), we do not deal with any issue in respect of those categories which might otherwise have been presented.

sought to raise the question of the proper criterion as applied to categories (1) and (2) above, but he has since abandoned his position in this respect and returned to the position taken in his deficiency notice, so our task is confined to the determination of such criterion in respect of category (3), i.e., additions or betterments, including relay rail which is held for future use.[14]

We now turn to petitioner's contention that the use of fair market value for relay rail is not a proper criterion. Petitioner supports its position on two grounds: (1) The use of average ledger value is a method of accounting which conforms to generally accepted accounting principles, and (2) in any event, the use of average ledger value clearly reflects income while the use of fair market value does not. As a consequence, petitioner asserts that its method of valuing relay rail satisfies the requirements of section 446,[15] and section 1.446–1(a)(1) and (2), Income Tax Regs.[16]

The essence of petitioner's argument concerning the nature of ACL's method of accounting for rail is that ACL's cost or investment in the released rail, as measured by average ledger value, is the only permissible reference point for valuing such

---

[14]The reason for respondent's limited position is founded on the "wash" character of the adjustments, which is present in categories (1) and (2), as explained in *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962, 994 (1976), on appeal (6th Cir., June 2, 1978). See also p. 883 *infra*. In this connection, we note that there is a potential for the occurrence of pick up of a rail, purchase of new replacement rail, and the retirement or replacement in kind in different taxable years which undermines the purity of the "wash" character of the transactions involved in those two categories. Indeed, the same potential would have an impact on the treatment of additions and betterments (category (3)). Neither of the parties has dealt with this potential in the context of the computation of the adjustments to be made as such, although petitioner has utilized the different-taxable-year factor in the course of its basic argument that "average ledger value" rather than fair market value is the proper criterion.

[15]SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

[16]Sec. 1.446–1 General rule for methods of accounting.

(a) *General rule.* (1) Section 446(a) provides that taxable income shall be computed under the method of accounting on the basis of which a taxpayer regularly computes his income in keeping his books. The term "method of accounting" includes not only the overall method of accounting of the taxpayer but also the accounting treatment of any item. * * *

(2) It is recognized that no uniform method of accounting can be prescribed for all taxpayers. Each taxpayer shall adopt such forms and systems as are, in his judgment, best suited to his needs. *However, no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income.* A method of accounting which reflects consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will *ordinarily* be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year. [Emphasis added.]

rail which is consistent with the retirement method of accounting and in accord with generally accepted accounting principles. Petitioner argues that, under this method of accounting, the cost involved in a replacement transaction is nothing more than ACL's investment in the rail involved in the process of replacement, that is, the rail released and the rail applied in replacement. Petitioner then defines ACL's investment in the rail removed as the cost of an aliquot portion of all rail in the track structure, i.e., average ledger value. The concept advanced is essentially one of a carryover of cost which petitioner justifies on the ground that there is no addition to the capital account since the cost of the replacement rail is expensed.

Although rejecting the concept that the RRB is a depreciation method, petitioner nevertheless seeks sustenance from the fact that cost or investment rather than fair market value is the usual foundation for depreciation calculations and, therefore, lends support to petitioner's position with respect to the use of average ledger value. In our view, the entire discussion of depreciation by both parties is beside the point. To be sure, the use of the RRB method is founded on section 167, which deals with depreciation. See *Louisville & Nashville Railroad Co. v. Commissioner,* 66 T.C. at 994–995, and cases cited thereat. But the fact that section 167 may be the foundation for the RRB method does not mean that such method should be presumed to include each and every attribute of ratable depreciation. Indeed, we have recognized that, in application, the RRB is at best the "rough equivalent" of depreciation (see *Chesapeake & Ohio Ry. Co. v. Commissioner,* 64 T.C. 352, 364 (1975)), and has its own built-in peculiarities (64 T.C. at 365). Other courts have also rejected the use of the cost or investment element of depreciation in determining the proper criterion for valuing relay rail, even though they have accepted the general characterization of the RRB method as a method of depreciation. *Missouri Pacific Railroad Co. v. United States, supra; Chicago, Burlington & Quincy R. Co. v. United States, supra; United States v. St. Louis-San Francisco Railway Co., supra.* See also *Louisville & Nashville Railroad Co. v. Commissioner, supra.*

We have a similar reaction to petitioner's attempt to fit the question of the proper valuation of relay rail into the inventory mold. Petitioner argues that it accounts for its new and released rails through a materials and supplies account, that this is an

inventory account, and that therefore the principle of valuation at lower of cost or market should apply.[17] Whatever application inventory valuation principles may have in other situations, their extension to the RRB method and the issue involved herein has been considered and rejected. *United States v. St. Louis-San Francisco Railway Co.*, 537 F.2d at 315; *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. at 998.

Nor can we agree with petitioner that respondent's use of the fair market value of relay rail (with one exception, in respect of the taxable year 1961, based on the particular circumstances herein, see pp. 885 – 886 *infra*) involves the creation of taxable income in the form of unrealized appreciation in respect of such rail. This argument has also been considered and decided adversely to petitioner on the ground that what is involved is simply a reduced deduction. *United States v. St. Louis-San Francisco Railway Co.*, 537 F.2d at 315; *Chicago, Burlington & Quincy R. Co. v. United States*, 455 F.2d at 1012.

The argument of the parties regarding the status of the RRB method as a method of accounting has a strange focus. In view of petitioner's failure to claim any benefits under section 481 (and its concession at trial that, in any event, any such claim would fail on the ground of failure of proof), we have no need to deal directly with the question which confronted us in *Fruehauf Corp. v. Commissioner*, 42 T.C. 83 (1964), affd. 356 F.2d 975 (6th Cir. 1966), cert. denied 385 U.S. 822 (1966). The focus of the "change" argument herein appears to be based upon the following syllogism advanced by petitioner: (1) The use of average ledger value conforms to the regulations of the Interstate Commerce Commission in respect of financial accounting practices of railroads; (2) such use is a generally accepted method of accounting which conforms with industry practice; (3) there is a presumption that, under such circumstances, such method of accounting cannot be changed by respondent in the absence of proof that his alternative clearly reflects income; (4) respondent has failed to provide such proof because his experts articulated a theoretical or hypothetical analysis, since there was no proof that any other railroad voluntarily (i.e., aside from the compulsion of Rev. Rul. 67–145,

---

[17]It seems clear that in this case, as in all the other cases involving the issue of the proper criterion for valuation, the fair market value of the rail in question is higher than cost, i.e., average ledger value.

1967–1 C.B. 54) had utilized fair market value in valuing relay rail. There are several defects in petitioner's syllogism.

At the outset, we note that, as petitioner itself admits, the fact that its use of average ledger value conformed to regulations of the Interstate Commerce Commission is clearly not determinative. *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 15 (1974); *United States v. St. Louis-San Francisco Railway Co.*, 537 F.2d at 315 n. 8. At best, the regulations are entitled to be given some weight, although the degree of such weight is questionable in the instant case in view of the fact that such regulations are susceptible of an interpretation consistent with respondent's position. See *United States v. St. Louis-San Francisco Railway Co.*, 537 F.2d at 314–315.

The critical defect in petitioner's syllogism, however, lies in its attempt to create a presumption, thereby in effect casting the burden of proof upon respondent to show that petitioner's method is erroneous. Initially, we note our disagreement with that element of the syllogism which is predicated upon the assertion that the testimony of respondent's expert witnesses should be disregarded because such testimony had no foundation in the actual application of the RRB method by the railroad industry. Given the perceived requirements of the Interstate Commerce Commission, it is not surprising that railroads would not (absent Rev. Rul. 67–145, *supra*) have utilized the fair market value criterion in respect of relay rail. Our own careful examination and evaluation of the testimony of respondent's witnesses has convinced us that respondent's position offers *at a minimum* a reasonable alternative method of valuation. We are reinforced in our conclusion by the fact that the previously decided cases have uniformly sustained respondent's position. See p. 868 *supra*. Under these circumstances, we think that petitioner's position simply reflects the contention that there should be a "presumptive equivalency between tax and financial accounting"—a position which the Supreme Court has recently rejected with unmistakable clarity. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979).[18]

---

[18]The Court articulated its position as follows:

"Finally, a presumptive equivalency between tax and financial accounting would create insurmountable difficulties of tax administration. Accountants long have recognized that "generally accepted accounting principles" are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. 'Generally accepted accounting principles' rather,

We find totally unpersuasive petitioner's attempt to distinguish the previously decided cases involving the proper criterion for valuing relay rail. These attempts include the arguments that (a) the Court of Claims in *Chicago, Burlington & Quincy R. Co. v. United States, supra,* erroneously assumed that the position taken by the Government in respect of the use of fair market value (which is the position of the respondent herein) was in accord with the requirements of the Interstate Commerce Commission and therefore presumably in accord with industry practice and (b) the subsequently decided cases merely followed the Court of Claims and therefore the decisions therein were posited on the same assumption, equally erroneously in petitioner's view. Any fair reading of the opinion in *Chicago, Burlington & Quincy* and the opinions in the subsequently decided cases clearly reveals that the judicial analysis involved was not so confined. In any event, it would appear that even if we accept petitioner's premise (which we do not), it does no more than reflect a distinction without a difference in light of the Supreme Court's pronouncements in *Thor Power Tool Co. v. Commissioner, supra.*

Nor are we impressed with petitioner's attempts to distinguish *Louisville & Nashville Railroad Co., supra,* on the ground that, in that case, the respondent had the burden of proof and consequently petitioner may have felt it unnecessary to present as strong a case as it might otherwise have put forward. We think this argument is fatuous, to say the least; if anything, our holding in favor of respondent in that case would seem to militate against petitioner herein.[19]

We are likewise unimpressed by petitioner's argument that, if respondent's position herein in respect of the use of fair market value for valuing relay rail is correct as applied to additions or

---

tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management. Such indeed is precisely the case here. Variances of this sort may be tolerable in financial reporting, but they are questionable in a tax system designed to ensure as far as possible that similarly situated taxpayers pay the same tax. If management's election among 'acceptable' options were dispositive for tax purposes, a firm, indeed, could decide unilaterally—within limits dictated only by its accountants—the tax it wished to pay. Such unilateral decisions would not just make the Code inequitable they would make it unenforceable. [Fn. refs. omitted.]"

[19]The issue of the use of fair market value as the criterion for valuing relay rail was raised by way of an amendment to answer with respect to the taxable years 1955 through 1963. This was not the situation in respect of the taxable year 1964, where the burden of proof was on the petitioner. (See 66 T.C. at 997.) We also note in passing that counsel for petitioner herein was also counsel for the taxpayer in the *Louisville & Nashville* case.

betterments, logically he should use the same standard in valuing rail released from the track structure by way of retirement or replacement in kind. At least one court has articulated a rationale for this disparate treatment. See *United States v. St. Louis-San Francisco Railway Co.*, 35 AFTR2d at 75–1322, 75–1 USTC par. 9395, at p. 86, 987. But more significantly, petitioner's contention assumes that respondent's position where a retirement or replacement in kind is involved is correct, which may or may not be the case. That issue is not before us, having been resolved in petitioner's favor by respondent's abandonment of his claim with respect to these two categories. See p. 870 *supra*. In any event, petitioner's argument, in this context, is without merit. In so stating, we are reminded of the famous comment that "A foolish consistency is the hobgoblin of little minds." See Emerson, R. W., "Essay on Self Reliance."

Whether we view this case as involving a change in accounting method (see *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. at 998)[20] or as petitioner's use of average ledger value for relay rail in respect of additions or betterments failing clearly to reflect income, we conclude that respondent should prevail. The fact that the use of such value may conform to generally accepted accounting principles based upon industry practice is not determinative that the requirements of section 446 and the regulations thereunder (see nn. 15 & 16 *supra*) have been satisfied. *Thor Power Tool Co. v. Commissioner, supra*. Similarly, the fact that respondent changed his mind and revoked his previously issued technical advice memorandum, which had been favorable to the position taken by petitioner herein (see n. 10 *supra*) supplies no predicate for rejecting the validity of respondent's determination. *Dixon v. United States*, 381 U.S. 68 (1965); *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180 (1957). The Commissioner is given wide discretion in the area of determining whether accounting methods clearly reflect income and the taxpayer has a heavy burden to show that respondent has clearly abused his discretion so that his determination can be held to be arbitrary. See *Thor Power Tool Co. v.*

---

[20]We again note that petitioner makes no claim for adjustment based upon the position that respondent has imposed a change in accounting method. See p. 872 *supra*.

*Commissioner, supra; Photo-Sonics, Inc. v. Commissioner,* 42 T.C. 926, 933 (1964), affd. 357 F.2d 656 (9th Cir. 1966).

In short, our analysis of the record and of petitioner's arguments herein reveals no justifiable reason for concluding that petitioner has satisfied its burden and that consequently we should depart from the position reflected in the opinions of the previously decided cases which have uniformly sustained respondent's use of fair market value as the measure of the "salvage value" of relay rail in determining the deduction to which a taxpayer railroad is entitled in respect of additions or betterments to its system. We have been mindful throughout our analysis of the inappropriateness of attempting to correlate the RRB method with other methods of accounting; as petitioner itself admits, the RRB method is "unique." Perhaps the cardinal reason for our conclusion is articulated in the following extract from the opinion of the Court of Claims in *Chicago, Burlington & Quincy R. Co.* (455 F.2d at 1011–1012):

The issue turns on the manner in which [the railroad] employs retirement-replacement-betterment accounting. As discussed earlier, [the railroad] charges to expense the current cost of making rail replacements. The aggregate of such costs, reduced by the salvage value of replaced rail, thus represents the allowable depreciation deductions for such transactions for the account as a whole * * * . The symmetry of replacement accounting demands that if the high costs of replacement are to be charged to current expense, then salvage value assigned to reusable rail for relay as additions or betterments must correspondingly be based on current values. Otherwise, the allowable deduction for depreciation for the account as a whole is distorted, will in effect tend to constitute accelerated depreciation, and thus will not reflect a reasonable allowance for "exhaustion, wear and tear (including a reasonable allowance for obsolescence)," as required by sec. 167 of the Internal Revenue Code (1954).

See also *Missouri Pacific Railroad Co. v. United States,* 497 F.2d at 1400–1401.

### b. *Fair Market Value*

The second component of the relay rail issue is one of valuation. Having concluded that fair market value is the proper criterion for valuing relay rail for the purpose of computing deductions under the RRB method, we must now ascertain what that fair market value was during the taxable years in question.

Respondent determined that the fair market value of the relay rail released from ACL's track system during the years

1958 through 1961 was $80 per gross ton. Petitioner, on the other hand, maintains that the fair market value during these years could not have exceeded $60 per gross ton. After a careful examination of the record, we conclude that respondent's determination of $80 per gross ton should be sustained.

At the outset, we note that the determination of fair market value in this case is complicated by a number of factors. First, the lapse of time between the years at issue and the issuance of the notice of deficiency has caused some serious practical problems. Respondent recognized these problems in his Rev. Proc. 68–46, 1968–2 C.B. 961, wherein the difficulties were described as follows (p. 962):

SEC. 2. BACKGROUND.

.03. The Internal Revenue Service recognizes that any adjustments to be made in accordance with Revenue Ruling 67–145, for taxable years that ended prior to May 8, 1967, present complex valuation and accounting problems. Appraisals are not practicable in the case of such reusable railroad track materials because much of such track materials have been reinstalled in track and inspections of such materials in later years would not accurately disclose their fair market values as of the time they were recovered. Identification of previously recorded entries on the books and records, and adjustments thereto, would involve a very difficult and burdensome task. To alleviate these problems, a simplified procedure for making necessary adjustments arising from the application of Revenue Ruling 67–145 is provided by this Revenue Procedure.

Second, and perhaps more characteristic of this situation, is that railroads (including ACL) have traditionally accounted for all relay rail as a single asset class, irrespective of the pattern weight, age, history of use, or quality of the individual rail.[21] As a consequence, the accounting methods utilized by ACL, and other railroads, over the years are not responsive to the informational requirements of our present inquiry.

Respondent's solution to these problems was also contained in Rev. Proc. 68–46, *supra*. Thus, for years ending prior to May 8, 1967, railroads were permitted to determine the salvage value of relay rail at an amount equal to the average of the market price of such rail new and the market price for such rail as scrap. The

---

[21]The accounting technique which reflects this single asset class approach was the use of a uniform or constant value of $25 per gross ton assigned to all relay rail. Distinctions were not even made for scrap rail, which was also assigned a value of $25 per gross ton upon its release from the system, until the scrap rail was sold.

valuation thus provided for may be expressed in terms of a formula:

$$V = 1/2 \cdot (N\text{-}S) + S$$

where $V$ = value of relay rail
$N$ = price of new rail
$S$ = price of scrap

Under this formula, the determination of the value of relay rail is actually based upon the remaining useful life of the rail, in accord with the expected use of the *average* relay rail.[22] This general approach was adopted by this Court in *Chesapeake & Ohio Ry. Co. v. Commissioner*, 64 T.C. at 389–392.

With this background in mind, we now turn to petitioner's first argument. Petitioner argues that the value for relay rail used by respondent in the notice of deficiency, $80 per gross ton, was based on the formula contained in Rev. Proc. 68–46, *supra*, and that the formula approach does not approximate market value. Therefore, respondent's determination is arbitrary, and as a consequence, it not only does not enjoy the usual presumption of correctness but requires that the burden of proof as to fair market value be placed upon respondent.

Petitioner fails to recognize, however, that respondent's determination is actually based on a number of factors, discussed *infra*, and see also n. 22 below, and is not solely derived from a formula. In any event, in light of the circumstances and difficulties encountered in determining fair market value described above, we think the formula provided a reasonable and useful guide to determining fair market value. See n. 29 *infra*. Indeed, a formula approach was utilized by this Court in *Chesapeake & Ohio Ry. Co. v. Commissioner, supra*. See *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. at 997 n. 17. See also *Chicago, Burlington & Quincy R. Co. v. United States*, 455 F.2d at 1011. Accordingly, we cannot conclude that

---

[22]The formula contained in Rev. Proc. 68–46, 1968–2 C.B. 961, contains a number of built-in assumptions which, in view of the practical problems previously referred to, are not unreasonable:

(1) that the value of relay rail lies somewhere between the value (price) of new rail and scrap rail;

(2) that such value can be expressed as a function of the remaining useful life of the relay rail, and is directly proportional to the difference between the price of new and scrap rail; and

(3) that the coefficient of 1/2 actually states the not unreasonable assumption that 50 percent of the useful life of the rail remains.

respondent's determination is arbitrary, or that it is based upon an arbitrary methodology.[23]

We now reach the factual question of value itself. Petitioner claims that the fair market value of relay rail never exceeded $60 per gross ton during the years 1958 through 1961. The major thrust behind petitioner's position is its assertion that in any given year, the average remaining service life for all relay rail released from the ACL system was between 20 and 25 percent of useful life of new rail. Presumably, this 20- to 25-percent figure, when placed in an appropriate formula, yields a value for relay rail less than $60 per gross ton.[24] On the basis of our evaluation of the record, much of which is inconclusive and lacking in sufficient data to substantiate petitioner's claims, we simply reject this factual premise.

The record contains considerable evidence regarding the useful life of new rail and the remaining service life of relay rail. Much of petitioner's presentation focused on the so-called tons of freight approach to determining the remaining service life of

---

[23]Petitioner suggests that the problems encountered in determining the fair market value of relay rail should go to the merits of the issue regarding the proper criterion to use in valuing relay rail under the RRB method. We disagree. The major problems in determining value are the result of inadequate accounting information about relay rail, a deficiency in ACL's accounting methods prior to and during the years at issue. See p. 877 *supra*. Indeed, respondent, in determining the $80 figure of fair market value, took into account these problems as they applied to petitioner and arrived at a figure that was less than the figure which would have obtained through the automatic application of Rev. Proc. 68–46. See calculations in last column of table in n. 27 *infra*, which take into account a 10-percent weight loss although petitioner herein concedes that such loss, due to cropping, has otherwise been accounted for and that the factor for such loss should only be 5 percent. If the reduction due to weight loss were so limited, the figures referred to would be even higher.

The Court's reference in *Chesapeake & Ohio* to the formula upon which Rev. Proc. 68–46 is based as "admittedly arbitrary" (see 64 T.C. at 389) was not intended to provide a foundation for holding that the respondent's determination based upon the formula was of such a nature as to destroy the presumption of correctness and shift the burden of proof; indeed the Court specifically indicated to the contrary when it recognized that the formula might well be applicable in other circumstances (see 64 T.C. at 392).

The details of how respondent arrived at a figure less than that which would have been produced by the automatic application of the formula in Rev. Proc. 68–46 has not been elucidated but since we hold that the use of the formula would not be arbitrary, we see no basis for finding arbitrariness because of the lack of elucidation, particularly in view of the numerous imprecise elements involved in valuing relay rail.

[24]Petitioner does not specify how the 20- to 25-percent figure for remaining useful life of relay rail is translated into a value. Using the formula approved by the Court in *Chesapeake & Ohio Ry. Co. v. Commissioner*, 64 T.C. 352, 389–392 (1975), as an example, the following values are obtained:

| Year | $V^1 = .30 \ (N-.95) + .95$ | $V^1 = .25 \ (N-.95) + .95$ | $V^1 = .20 \ (N-.95) + .95$ |
|------|------|------|------|
| 1958 | $70.87 | $66.61 | $62.35 |
| 1959 | 71.60 | 67.26 | 63.05 |
| 1960 | 69.36 | 64.99 | 60.62 |
| 1961 | 62.94 | 58.12 | 53.30 |

---

[1]Values are in dollars per gross tons.

rail. Under this approach, useful life of new rail is measured in units of gross tons of traffic that pass over the rail, expressed in millions of gross tons (MGT). Based on its own experience, the standard for average useful life employed by ACL for all rail was as follows:

131/132-pound rail—720 MGT
112/115-pound rail—480 MGT
100-pound rail—360 MGT[25]

On the basis of these standard tonnages and the testimony of an assistant engineer of way, petitioner maintains that ACL followed the practice of removing rail from its first track position when roughly 50 percent of its useful life had been used. In addition, petitioner claims that, as a practical matter, much of the ACL rail was left in its first position longer, up to two-thirds of its useful life, due to the lack of available cash for purchases of new rail.

On balance, we find petitioner's data, assumptions, and contentions regarding useful life of new rail and remaining service life of relay rail based on MGT's incomplete and unpersuasive. Initially, we note that the studies relied on by petitioner acknowledge that they are founded on data which are clearly insufficient for the long-range projections of useful life made by petitioner for the purposes of this case. Particularly, since the studies relied on by petitioner were intended primarily for planning purposes, their value as proof of actual practice of the ACL is highly suspect. Second, considering the various technological improvements in rail and in its installation (especially continuous welded rail which, in some cases, had what appears to have been a readily correctable defect[26]), and the fact that petitioner's figures for rail life in MGT are averages which include rail placed on curved sections with no relay value, we believe the useful life of new rail in terms of MGT is greater than petitioner's claims. Moreover, petitioner's proof is totally

---

[25]The study which produced the tonnage figures for average useful life of all new rail also included a statement, attributable to another report, that the useful life of rail used as tangent track is 940 MGT for 132-pound rail and 694 MGT for 115-pound rail.

[26]One point of contention involves the service life (in terms of MGT) of 131-pound rail as relay rail. Due to its peculiar structural characteristics, 131-pound rail sections which were jointed together (rather than welded) developed certain problems which accelerated the need to replace the section and crop its ends. Such structural problems were readily alleviated through use of the continuous welded rail process.

.

lacking with respect to the number of MGT's of traffic carried by rail in new rail territory before that rail was replaced. Therefore, the claim that even the *best* rail released by ACL had 50 to 60 percent of its useful life already used, as measured by MGT, understates the remaining service life, especially in light of the quantity of high quality rail made available through second main line abandonments due to centralized traffic control (CTC) installations. Accordingly, we find the tons of freight approach to determining useful life and remaining service life an unreliable guide. See p. 888 *infra.*

Petitioner also attempts to establish the remaining service life of its rail by the classification of relay rail into two different groupings. The attempted distinctions are based on the quality and the remaining service life of the reusable rail. Petitioner estimated that 50 percent of the relay rail was pretty good relay rail and should be valued at $65 per gross ton. The remaining 50 percent of the relay rail was described as not so good, having a value of $55 per gross ton. Striking an average of these two groupings, petitioner concluded that the value of its relay rail was $60 per gross ton. As with its approach using MGT, we find petitioner's estimates here of remaining service life, and thus value, to be understated.

Ultimately, we sustain respondent's determination because we find considerable support in the record for the value of $80 per gross ton. The evidence developed by respondent, including statistics regarding the source and application of relay rail during the years in issue, was convincing. The statistics revealed that significant portions of relay rail released by ACL during these years were of high quality, with considerable remaining useful life, and hence high value. Also, much of this rail was picked up not because of wear, but only because it was no longer needed in a second main line being retired due to centralized traffic control installations. Finally, although we recognize that the market in relay rail was somewhat artificial because of the magnitude of relay rail retained by the railroads, it is a factor to be considered and it does support the respondent's determination.

We note that our value determination is not expressed in

terms of a formula as was done in *Chesapeake & Ohio Ry. Co. v. Commissioner, supra.*[27] There are two reasons for our departure from the formula approach in this case. First, neither party has argued that such an approach is required. More importantly, however, in our opinion, convincing evidence, comparable to that presented in the *Chesapeake & Ohio* case, that the remaining useful life of rail is directly proportional to its fair market value, has not been presented. See *United States v. St. Louis-San Francisco Railway Co., supra,* 35 AFTR2d at 1323, 75–1 USTC par. 9395, at p. 86,988. In light of this record, and the lack of proof regarding the connection between remaining useful life and value, automatic use of a formula to arrive at our decision herein would be inappropriate.[28]

### c. *Adjustments Based on Fair Market Value*

The final component of the relay rail issue involves the adjustments necessitated by the use of fair market value for valuing relay rail. Respondent has applied his adjustment based upon a fair market value of $80 per ton, however, only to the extent that relay rail was laid in additions and betterments during the years 1958 through 1961. These adjustments served to

---

[27]Values for relay rail obtained by adopting the formula approved and employed by this Court in *Chesapeake & Ohio Ry. Co. v. Commissioner,* 64 T.C. 352, 389 (1975), with a remaining useful life in the range between 40 and 50 percent (and retaining the 10-percent adjustment for weight loss due to cropping of rail), support respondent's determination herein.

| *Year* | $V = .40 \ (N-.95) \ + \ .95$ | $V = .50 \ (N-.95) \ + \ .95$ |
|--------|-------------------------------|-------------------------------|
| 1958 | $79.38 | $87.90 |
| 1959 | 79.51 | 87.84 |
| 1960 | 73.29 | 82.82 |
| 1961 | 72.60 | 82.24 |

Moreover, the evidence herein demonstrates that the terrain of the area serviced by the ACL is characterized by more gradual rail wear than in those areas serviced by the Chesapeake & Ohio Railway, resulting in more valuable relay rail released from the ACL for equivalent MGT's.

[28]Petitioner advances two arguments in suggesting that, if we were to adopt a formula such as this Court did in *Chesapeake & Ohio,* we should make certain adjustments thereto. The first is based on the premise that in *Chesapeake & Ohio* the relay rail came from new rail territory while in the instant case, most of such rail came from relay territory. We do not consider the suggested distinction significant; the evidence herein indicates that a substantial portion of the relay rail was in excellent condition—one example is the fact that much of the relay rail came from track released as a consequence of ACL's installation of CTC. The second is that there is an alleged absence of any record of sales "which the Court found influential in the *Chessie* case." Without elaborating on whatever nuances may exist as to the quantity or quality of such evidence contained in the record in this case and that of *Chesapeake & Ohio,* we think it sufficient to note that we found sufficient probative evidence as to sales for the purposes of our decision herein. See p. 881 *supra.*

reduce the corresponding replacement and retirement deductions claimed by ACL. See Rev. Proc. 68–46, 1968–2 C.B. 961.

Respondent sought no adjustment with respect to relay rail that was picked up and subsequently relaid in replacements, accepting petitioner's value of $25 per ton for these categories. This was because the credit to or reduction in operating expense upon salvage or recovery would be offset by the charge to operating expense when the rail was laid in replacements, regardless of whether the rail recovered was assigned a value of $25 or $80 per gross ton.[29] Such an occurrence is termed a wash. Similarly, as to scrap rail, since subsequent income or loss on disposition of the scrap was measured by the value assigned to scrap on its recovery from the track system, the net effect of the book entry on recovery and disposition will also result in a wash, regardless of the value initially assigned. However, when relay rail is subsequently relaid as an addition or a betterment, some or all of its basis is capitalized, thereby suspending the offsetting effect for what may be substantial periods of time.

Petitioner contends that only rail released in new rail replacements and which is subsequently relaid in additions and betterments should be considered in making the adjustment of ACL's replacement and retirement expense. The basis for petitioner's position is the symmetry of replacement accounting rationale espoused by several courts holding that fair market value is the proper criterion for valuing relay rail because replacement expense is based upon the value of new rail. See *Chicago, Burlington & Quincy R. Co. v. United States*, 455 F.2d at 1011–1012; *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. at 997–998; see also p. 876 *supra*. Basically, petitioner's argument is that given the foundation of the symmetry rationale, it is inappropriate to match the historical cost of relay rail being applied against the fair market value of relay rail being released, as respondent does herein in calculating the adjustments for additions and betterments where relay rail is applied.

---

[29]Respondent's computation of the adjustment in this respect makes two assumptions:

(1) the relay rail was released and then reapplied during the same taxable year; and

(2) there was no variance in value of the relay rail between the time it was released and the time when it was applied.

For purposes of this case, we think these assumptions, while not strictly accurate, are reasonable, and the differences in tax consequences resulting from the assumptions are minimal. Similar considerations apply to rail released and sold as scrap. See also n. 14 *supra*.

Therefore, petitioner reasons that only the relay rail which is released as the result of new rail replacement should be adjusted.

At first blush, petitioner's argument has a considerable amount of appeal. However, upon careful examination, we conclude that it lacks merit. First, we reiterate our decision to follow the established precedent requiring fair market value and sustaining respondent's computation based on Rev. Proc. 68–46, 1968–2 C.B. 961, although we note that none of these cases explicitly considered the point. But see *United States v. St. Louis-San Francisco Ry. Co.*, 35 AFTR2d at 75–1319, 75–1 USTC par. 9395, at p. 86,984, par. 10.

Second, the symmetry rationale is not the sole rationale for using the fair market value standard on the broader basis utilized by respondent. The underlying theory of the RRB method of accounting is that charges to expense for all items replaced or retired during a period are the rough equivalent of depreciation. To compute the expense deduction under this theory, it is necessary to offset the value of the released rail against the aggregate expense of making the replacements and retirements. Thus, it is important to view the need for valuation from the perspective of the two separate transactions which exist: (1) When rail is being released from the system, and (2) when rail is being applied. As was explained in *United States v. St. Louis-San Francisco Ry. Co.*, 35 AFTR2d at 75–1322, 75–1 USTC par. 9395, at p. 86,987:

However, it is clear from the evidence that the replacement and relay of a piece of rail is more than just a movement from one place to another. Each time a rail is taken up and replaced by another piece of rail, it is an accounting transaction, which is essentially a retirement of the rail from one place in the track structure, and an acquisition and laying of the rail into another place in the track structure. This is reflected in the accounts by using the salvage value placed on the rail as the cost expense taken when the second replacement occurs. The basic theory of the RRB method of accounting for rail is that the entire system of rail is one big asset, and, therefore, when a piece of rail is taken out of that big asset, it loses the connection that it had to the ledger value that it had when it was in place in the track structure. As was pointed out by one of the Government's expert witnesses, it is acquired just as if the railroad had gone out and bought it. * * *

Accordingly, there is a reason for the valuation of rail being released which is independent of the valuation of the rail being applied.

Third, once the fair market value standard for valuing rail released from the system has been implemented, the rail retains that value in future transactions involving the system, e.g., being applied as replacements, betterments, and additions. As a consequence, symmetry is not offended once the transition to fair market value has been accomplished because rail being applied will reflect more current costs through the use of that value.

The problem in adjustment suggested by petitioner herein is one caused by the transition from petitioner's long-standing method of valuation to that of fair market valuation. Respondent has attempted to deal with this and other problems in Rev. Proc. 68–46, *supra*. In addition, the Revenue Procedure allows amortization of the adjustment to taxable income over a 20-year period to ameliorate the short-term effect of the adjustments. We think respondent's solution is reasonable because it isolates (as well as can be done within the accounting information available) transactions involving released relay rail in which the counterbalancing or offsetting transaction may be postponed for some time.[30]

#### d. *Adjustment for 1961*

Petitioner's final argument is that, since respondent's adjustment for 1961 is more than an offset to replacement and retirement deductions, it has the effect of creating income. See p. 867 *supra*. Petitioner views this as a serious defect in the valuation of relay rail at its fair market value upon release from the system rather than at cost, and claims this as a reason for not using the criterion of fair market value. We disagree. We view this set of circumstances merely as an inevitable consequence of the use of the RRB method of accounting.

However, we believe respondent is incorrect in his determination for 1961 to the extent that his adjustment exceeds the total deduction claimed by ACL. Respondent has explained his use of fair market value for recovered track materials as follows:

Accordingly, railroads using the "retirement method" of accounting for depreciation for their track account assets must value their recovered track materials at their fair market values at the time such track materials are

---

[30]It is anticipated that, in the Rule 155 computation, petitioner will be given the benefit of any adjustment based on the 20-year amortization provision of Rev. Proc. 68–46.

replaced or retired and transferred to supplies or scrap accounts (without disposition). In computing the deduction for allowable depreciation for the taxable year on all remaining track account assets, the fair market values of such recovered track materials must be taken into account as *offsets* against the cost of the replacements and, in the case of retirements, against the basis of the retired assets as reflected in the capital accounts. Such fair market values of the recovered track materials will be reflected in the supplies or scrap accounts as the basis of the recovered track materials transferred to such accounts. [Rev. Rul. 67–145, 1967–1 C.B. at 55; emphasis added.]

In addition, this offset rationale has been employed by various courts in response to arguments that valuation at fair market value results in taxation of unrealized appreciation and thereby creates income. See p. 872 *supra*. Respondent deals with this argument only in the most general terms and in the context of an assertion that such a negative result is in effect to compensate for errors on the petitioner's part for failing to use fair market value of relay rail in making adjustments for years prior to the taxable years before us. Given this limited response by respondent, his own use of the word "offsets" in Rev. Rul. 67–145, *supra*, and the care which other courts have used in dealing with the unrealized appreciation-creation of income argument, we think that, at least insofar as this case is concerned, petitioner's position should be sustained. Accordingly, the downward adjustment for 1961 should be limited to $38,760, the amount of the total deduction claimed or such higher figure as may be produced by the use of average ledger value rather than the assigned value of $25 per ton. In other words, petitioner should receive no deduction for 1961 in respect of the expense of relay rail used in additions or betterments.

One final word. The issues relating to the proper value to be attributed to relay rail under the RRB method are highly complex and involve the application of accounting methods in a specialized arena—the railroad industry—where the RRB has been a long-standing unique method of accounting for the track system.[31] One cannot help but wonder whether the use of the judicial process to resolve the problems such as the ones reflected in this case and in the previously decided cases represents a realistic and efficient use of our governmental processes. These problems seem to be of a character which could

---

[31] As has been pointed out, "Under this method, a railroad does not deduct depreciation as such, but in lieu thereof deducts as *expense, items which under the depreciation method should be capitalized.*" See *Chicago & North Western Ry. Co. v. Commissioner*, 29 T.C. 989, 1004 (1958). (Emphasis added.)

better be resolved through mutual give and take between more knowledgeable personnel in Government and in the industry, who clearly have a greater capability of coping with the essentially imprecise elements involved, rather than through the judicial process and the concomitant attempt by the legal advocates to infuse a precisional quality into the arguments pro and con which simply does not exist. Cf. *Messing v. Commissioner*, 48 T.C. 502, 512 (1967).

## Grading

### FINDINGS OF FACT

Grading constitutes the preparation of land for the purpose of providing a flat and relatively straight base upon which the railroad track (consisting essentially of ballast, ties, and rail) is constructed. It consists of cut areas (excavations) and fill areas (embankments). Cut areas are those places where the land is leveled through excavation, and fill areas are those where the ground surface is brought up to level. The roadbed, or grading, for ACL's two track structure, on those sections of track involved herein, ranged in width from 35 to 60 feet, with most of the grading being 40- to 50-feet wide. Most of this grading consisted of fill areas, largely because the terrain was relatively flat and the track structure was in low lying areas. The standard separation of the centers of two parallel tracks on the ACL was either 13 or 14 feet.

As applied to railroad construction, grading not only includes the cost of clearing and grading the roadway, but also the cost of constructing protection for the roadway, tracks, embankments, and cuts. Under the uniform system of accounts prescribed by the Interstate Commerce Commission, grading includes, inter alia, expenditures pertaining to berm ditches, blasting, breakwaters, bulkheading, clearing land, dikes, ditches, dressing slopes, excavations for conversion of tunnels into open cuts, and retaining walls. Grading is measured in terms of cubic yards of excavation and embankment. ACL accounted for the initial cost of its grading in Account No. 3. Replacements of grading, and other items not accounted for in Account 3, were treated as current expenses and accounted for in Account 202.

Grading was generally retired pursuant to an Authority for Expenditure (AFE). Under such a procedure, ACL's operating

department was authorized by ACL's board of directors to retire grading and other operating assets involved in the retirement. Upon completion of the work required to effect a retirement, a roadway completion report was prepared by ACL's engineering department, showing the units of property retired and the cost, or Interstate Commerce Commission inventory value (a value assigned to assets put in service prior to 1913), at which the assets were carried on ACL's books. The actual journal entry recording a retirement required the approval of the Interstate Commerce Commission.

Before, during, and after the years at issue, 1958 through 1961, ACL was engaged in a program of installing centralized traffic control (CTC) along various segments of its track system. CTC is an electrical signal system which, through the use of switching equipment and bypass or passing tracks, enables the movement of trains over a single track system on a line which previously, without CTC, required a two track system.

ACL installed CTC primarily for economic reasons. The operation of a single track system signaled with CTC is more efficient and less expensive than the operation of a double or parallel track system without CTC. However, maintenance of the remaining single track correspondingly increases because of the increase in volume of traffic over that single track. CTC was installed on main lines of ACL's track system regardless of when the rail on those lines had been previously replaced.

As a result of its installation of CTC, or because of other considerations, ACL determined that a second main line was unnecessary at certain locations in its system. Accordingly, ACL removed portions of its second (or parallel) main line of track in four sections of its system during the years 1958 through 1961. Rails, other track materials, ties, and, in some instances, ballast were taken up, leaving in those areas a single line of track with occasional passing tracks where previously two parallel tracks had been employed. On curves, the entire roadbed was occasionally used by starting the remaining single track on the old northbound main line and ending around the curve on the old southbound main line. Such realignment of the single track on curves served to reduce the degree of curve and thus reduce wear on the rails. ACL then retired on its books the rail, other track materials, ballast, and grading associated with the retired lines of track.

The four sections of the ACL system affected by the abandonments of second main line were those which lay between:

(1) Contentnea, N. C., and the South Carolina State line;
(2) Jesup and Burch, Ga.;
(3) Jacksonville and Yukon, Fla.; and
(4) Dunnellon and Vitis, Fla.

Second or parallel main line track was picked up and retired in those four sections during 1958 to 1961, except between Jesup and Nahunta, Ga. (a portion of the Jesup-Burch section). Grading for a second track between Jesup and Nahunta was constructed between 1948 and 1952, but was never used other than for passing or side tracks, because a second main line was never installed between these points.

Unlike the rails, other track materials, ties, and to some extent ballast, which were physically removed when ACL retired its second main line in the above four sections of its system, the underlying grading for the double track system, with a few exceptions,[32] was left (and still is) in place. The ballast from the second track was not removed in some areas, but was spread to form the base for a road for off-track vehicles.

The roadbed from which the second track had been removed, or a portion of the roadbed located further toward the outside of the roadbed was used as a road for off-track vehicles. The road provided convenient and ready access for the maintenance of the roadbed, the remaining track, signal houses, bridges, and tressels, as well as access to areas adjacent to the roadbed. In addition, the wider roadbed was on occasion used for the temporary storage of materials and supplies, and would undoubtedly have been used in the event of a derailment. Beyond the area used as a road, towards the edge of the grading and the drainage ditch, lay 5 to 20 feet of grading overgrown with bushes, weeds, and other vegetation. This combination of the grading and the ballast still in place, together with the vegetation along the remaining track and road, provided additional drainage protection for the remaining track.

In 1973, ACL modified the passing track structure between

---

[32]In a couple of locations, a small portion of grading was removed and used to fill in washed out portions of grading supporting the remaining track.

Jesup and Burch, Ga., as part of its installation of CTC along that segment. The modifications consisted of relocations and extensions of the passing track, which involved installation of additional passing track over grading which had been allegedly retired and abandoned, but not removed, in 1960.

Generally, the number of passing tracks required in the installation of a CTC system depends upon the density of traffic over the particular segment of the line. The requirements for passing tracks on ACL's lines converted to CTC were determined on the basis of recommendations made by its transportation department as evaluated by the engineering department.

ACL, on its Federal income tax returns for the years 1958 through 1961, claimed retirement deductions for its unrecovered cost of rails, other track materials, ties, and ballast associated with the retired lines, which deductions were allowed by respondent.[33] It also claimed an abandonment loss deduction for grading in the amount of $69,674.55 on its 1961 return. Subsequently, by claims for refund filed in 1966 for years 1958, 1959, and 1960, ACL claimed abandonment loss deductions for grading in the respective amounts of $25,497.73, $79,864.78, and $204,203.34.

The abandonment loss deductions for grading claimed by ACL were based upon the assumption that the grading that supported the retired track (or, in the case of the Jesup to Nahunta segment, grading which could support a second track) was retired or abandoned. The amount of grading purportedly retired was computed with reference to track profiles of the four sections of the track system identified above. The deductions, as originally computed and claimed, were based on the premise that, since standard distance between centers of parallel tracks was either 13 or 14 feet, the useful life of the 13 or 14 feet of grading, viewed cross-sectionally and measured from the center of the remaining track toward the grading on which the retired track had been located, was retired or abandoned when one line of track was removed. Accordingly, the amounts ACL retired on

---

[33]We note, of course, that the amount of the retirement deduction for rail was adjusted by respondent. See pp. 867 – 868 *supra*.

its books were computed using cross sections of grading 13 or 14 feet in width from the center of the remaining track.[34]

In his notice of deficiency for the years 1958 through 1961, respondent disallowed the abandonment loss deduction for grading claimed for 1961 in its entirety. The abandonment loss deductions for grading claimed by ACL for the years 1958, 1959, and 1960 were disallowed in their entirety in the revenue agent's report for each of these years and are the basis herein of claimed overpayments or offsets against deficiencies asserted in respect of other items for those years.

Prior to the trial of this case, petitioner changed its position and recalculated the grading claimed to have been abandoned. The grading which is now claimed to have been abandoned has been computed under the assumption that 18 feet from the center of the remaining track is sufficient grading to accommodate off-track equipment, and that all grading outside the 18-foot distance was abandoned. The cubic yards of grading and the cost thereof, by section of grading involved, which petitioner now claims was abandoned are as follows:

| Location | Cubic yards | Cost | Year deductible |
|---|---|---|---|
| Contentnea to S.C. State line .... | 292,510 | $84,347.67 | 1961 |
| Jesup to Burch ..... | 277,633 | 148,283.29 | 1960 |
| Jacksonville to Yukon .......... | 7,209 | 2,729.16 | 1960 |
| Dunnellon to Vitius ............... | 42,809 | 17,116.51 | 1958 |
| | 135,563 | 54,202.27 | 1959 |

OPINION

Because a second main line was determined to be unnecessary at certain locations in its system, ACL removed large sections of the parallel track structure (rails, other track materials, ties, and, in some instances, ballast) in four sections of the system, leaving in those areas a single line of track with occasional passing tracks. With some minor exceptions, none of the grading was removed. However, ACL retired on its books the rail, other

---

[34]Cross sections 13 feet in width were used in computing grading, allegedly abandoned, located between Contentnea, N. C., and the South Carolina State line; between Jacksonville and Yukon, Fla.; and between Dunnellon and Vitis, Fla. A 14-foot cross section was used in computing grading allegedly abandoned between Jessup and Burch, Ga.

track materials, ties, ballast, and grading associated with the retired lines and has been allowed a deduction in respect thereof except for the grading.

The issue before us is the extent to which petitioner is entitled to a further deduction in each of its taxable years 1958 through 1961 for the grading associated with the track retirement, plus grading in a section of its system between Jesup and Nahunta, Ga., where there had never been a second or parallel track. ACL originally claimed abandonment loss deductions for grading computed on the assumption that the useful life of a 13- or 14-foot-wide cross section of grading,[35] measured from the center of the remaining track, was abandoned when one line of track was removed.

Prior to the trial of this case, petitioner changed its position and recalculated the amount of grading claimed to have been abandoned, computed on the assumption that 18 feet from the center of the single track is sufficient grading to accommodate off-track equipment, and that all grading located beyond 18 feet from the center of the track was abandoned or retired. Thus, not only do the amounts differ from those originally claimed, but the actual location of the grading on the roadbed also differs. In neither computation, however, has ACL retired grading in those sections where passing tracks remained in place.

A threshold dispute[36] between the parties is whether the grading abandonment loss deduction is controlled by section 165 or section 167. Respondent contends that the grading is a nondepreciable asset and that any loss sustained is governed by section 165 and consequently, under the pertinent regulations, the property must be "permanently discarded from use" in order to qualify for the loss deduction. Sec. 1.165–2(a), Income Tax Regs. Petitioner, on the other hand, contends that the grading is a depreciable asset, and argues that, as a result of the track removal, grading is no longer a part of the track system.

---

[35]The 13- or 14-foot-wide cross section of grading was used because the standard distance of separation between centers of two parallel tracks was either 13 or 14 feet.

[36]Respondent has raised a preliminary issue regarding the timing, or proper year, for claiming the abandonment loss deduction. He argues that, even assuming that the grading was otherwise abandoned or retired for tax purposes, the basis of petitioner's recalculation in 1976 of the amount of the claimed abandonment is evidence that ACL manifested no intent to abandon the specific grading involved prior to 1976. In light of our disposition of the abandonment issue, resolution of the timing issue is unnecessary, although we are constrained to note that we view this argument as having a theoretical rather than realistic foundation.

Petitioner recognizes that the grading is still intact and in place, but argues that actual disposition of the asset is not a requisite of the loss deduction, and that its claim meets the standard of "permanent withdrawal" articulated in sec. 1.167(a)–8(a), Income Tax Regs., on the ground that the grading was "withdrawn from productive use without disposition." Alternatively, petitioner contends that if section 165 is the governing section, then it has carried its burden of proving that the grading was "permanently discarded from use" within the meaning of section 1.165–2(a), Income Tax Regs.

As in the previously decided cases wherein the issue was raised, we find it unnecessary to resolve this initial dispute between the parties. See *Western Maryland Railway Co. v. United States*, 291 F. Supp. 935, 939 (D. Md. 1968); *Gulf, Mobile & Ohio R.R. Co. v. United States*, an unreported case (S.D. Ala. 1972, 31 AFTR2d 73–436); *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. at 1004–1007. We reach this conclusion because substantially the same criteria and considerations are involved in deciding whether grading was abandoned or retired, and we are convinced that the result would be the same under either section 165 or section 167.[37] Essentially, to be entitled to an abandonment loss deduction under either section, petitioner must establish an intent permanently to abandon the property, coupled with an act of abandonment. *Dezendorf v. Commissioner*, 312 F.2d 95, 96 (5th Cir. 1963), affg. a Memorandum Opinion of this Court; *Boston Elevated Railway Co. v. Commissioner*, 16 T.C. 1084, 1108 (1951), affd. 196 F.2d 923 (1st Cir. 1952). This means, as we have previously held, that:

the taxpayer must establish that the property actually did lose its useful value, and that he, by reason thereof, actually did write off and abandon the property as an asset in the particular year for which deduction of the loss is claimed. [*Burke v. Commissioner*, 32 T.C. 775, 780 (1959), affd. 283 F.2d 487 (9th Cir. 1960).]

---

[37]In this connection, we note that respondent, relying on *Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916, 925–932 (1976), and *Chesapeake & Ohio Ry. Co. v. Commissioner*, 64 T.C. 352, 376–384 (1975), argues that the grading is not a depreciable asset, within the meaning of sec. 167, because petitioner has presented no evidence on which a determination of useful life could be based. Although we find it unnecessary to deal directly with this argument, we think there may be merit to the view that an asset may qualify as meeting the description contained in sec. 167, even though because of failure of proof as to useful life the taxpayer may not be entitled to the "reasonable allowance" for depreciation authorized by that section. But see *Western Maryland Railway Co. v. United States*, 291 F. Supp. 935 (D. Md. 1968).

See *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. at 1007. Petitioner has failed to demonstrate an abandonment of grading by ACL by these criteria.

It is clear that ACL continued to use the portion of the roadbed where one track had been removed (or in the case of the Jesup to Nahunta, Ga., segment where the second track had never been applied)[38] as a road for its off-track vehicles, including maintenance vehicles. Indeed, petitioner no longer disputes the use of the roadbed but rather bases its claim upon the assertion that there is an outer portion of the grading, adjacent to the drainage ditch, which is overgrown with vegetation and not used—a portion which we note is considerably more narrow than the area ACL claims to have abandoned.

The grading in question, however, serves several purposes. It provides additional drainage protection for the roadbed, as well as the remaining track. It also invites use in the event of a derailment. More importantly, this outer edge of grading, which at one time provided support for a second track, now provides support for the grading used by petitioner's off-track vehicles as a road. Moreover, the pictorial evidence clearly shows road use of the grading outside the 18-foot-wide area, measured from the center of the remaining track, which petitioner now claims to have been abandoned. In addition, the evidence reveals that areas both inside and outside the 18-foot line were and are being used for the storage of materials and supplies, and the location of hot boxes, switching stations, mile posts, and other similar items. We are also cognizant of the potential for adjustments and modifications in track structure due to changes in rail traffic patterns and technological advances, or for other reasons, with respect to which the grading would serve a useful purpose. For example, petitioner's track structure between Jesup and Burch, Ga., was modified in 1973 with the installation of CTC, causing relocation and extension of passing track and use of allegedly abandoned grading.

Nor are we convinced that the fact that petitioner permitted portions of the outer grading to become overrun with vegetation is sufficient to justify petitioner's position, particularly since the

---

[38]We note that, in the case of this segment, it is even more difficult to find that the requisite criteria have been satisfied since there is no evidence that any particular event occurred within any of the taxable years before us which could be said to constitute abandonment or retirement of the grading associated with such segment.

record indicates that it was often necessary for petitioner to cut down such vegetation in order to improve visibility.

Petitioner tries to equate its cessation of the use of an asset (grading) for the specific purpose for which it was constructed or acquired, with an abandonment or retirement of that asset. It argues that where one track of a double track system is removed, the grading in excess of that necessary to support a single track does not merely lose value, it becomes useless, i.e., superfluous. This loss of utility, maintains petitioner, is sufficient to justify an abandonment loss under either section 165 or 167. But the benefits to petitioner which we have previously outlined contradict the factual premise of petitioner's argument, and thereby render it invalid. See *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. at 1007.

Finally, petitioner suggests that, in denying the deduction for grading which is no longer being used as part of the track structure where there is no second track, it is effectively being denied any depreciation on, or recovery of, the cost of these assets. We are not unaware of the fact that a taxpayer in petitioner's position may well find it difficult to present sufficient evidence to sustain an abandonment or retirement loss in respect of a portion of grading, because the grading involved will be an inseparable part of the total grading and the evidence is likely to do no more than reveal a lack of use. But nonuse has repeatedly been held not to constitute a sufficient basis for sustaining a loss. See *Talache Mines v. United States*, 218 F.2d 491 (9th Cir. 1954); *Citizens Bank of Weston v. Commissioner*, 28 T.C. 717 (1957), affd. 252 F.2d 425 (4th Cir. 1958); *Ewald Iron Co. v. Commissioner*, 37 B.T.A. 798 (1938). Moreover, contrary to petitioner's assertion, it could recoup its investment in grading by proving its useful life thereby entitling it to a depreciation deduction. See *Chesapeake & Ohio Ry. Co. v. Commissioner*, 64 T.C. 352, 377–384 (1975).[39]

On the basis of the record before us, we hold that the grading in operation was neither permanently withdrawn nor abandoned within the meaning of the regulations promulgated under

[39]In this regard, see sec. 185, which was added to the Internal Revenue Code as part of the Tax Reform Act of 1976, Pub. L. 94–455, and which offers the opportunity of amortization of petitioner's grading over a 50-year period.

sections 165 and 167. Petitioner is not entitled to the loss deductions claimed.

*Decision will be entered under Rule 155.*