STANDARD COMMODITIES IMPORT AND EXPORT CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Standard Commodities Import & Export Corp. v. Commissioner
Docket No. 3377-80.
United States Tax Court
T.C. Memo 1982-408; 1982 Tax Ct. Memo LEXIS 337; 44 T.C.M. (CCH) 513; T.C.M. (RIA) 82408; July 20, 1982. Eugene D. Silverman and Jeffrey C. Kahn, for the petitioner. William K. Shipley, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined an income tax deficiency of $81,192 *338 for the taxable year ended June 30, 1973, against Standard Commodities Import and Export Corporation (hereinafter referred to as "Standard" or "petitioner"). The deficiency stems from a $229,150 reduction in petitioner's net operating loss for the taxable year ended June 30, 1975, which in turn reduced a claimed net operating loss deduction for the 1973 tax year. The principal issue remaining for consideration is whether petitioner is entitled to a deduction for certain leasehold improvements which it allegedly abandoned during its 1975 tax year. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner, a California corporation, is an accrual basis taxpayer with its fiscal year ending June 30. At the time the petition was filed, petitioner's principal place of business was in Canoga Park, California. For all years relevant to this case, petitioner filed its Federal income tax returns with the Fresno, California, Service Center. During the years in issue, petitioner's principal business activity was the importation and sale of certain types of products from South America. *339 From July 1, 1970, until about October 2, 1974, petitioner's outstanding stock was held as follows: July 1, 1970-
Mar. 11, 1974-
Shareholder
Mar. 10, 1974
Oct. 2, 1974
David H. Taylor (President)
50.0%
30.0%
Eduardo Hertz
17.5 27.5 Samuel Moss
17.5 27.5 Scott Taylor (Secretary)
7.5 7.5 Richard Taylor
7.5 7.5 David H. Taylor is the father of Scott and Richard Taylor. Eduardo Hertz and Samuel Moss are unrelated to the Taylors. David H. Taylor has been president of petitioner since its organization in 1953 until at least the time of trial herein, and the evidence indicates that he dominates its affairs. On or about October 2, 1974, petitioner redeemed Eduardo Hertz's shares, with the result that David H. Taylor and his sons once again controlled a majority of the outstanding shares, leaving Mr. Moss with a minority interest. In June of 1971, David H. Taylor and his wife Paula leased a substantially unimproved industrial building from Industrial Park, Inc. (IPI). The lease was for five years, commencing September 1, 1971, with a monthly rental of $2,446.06. Under the lease, the Taylors could extend their tenancy for three *340 years, and at any time during the fourth year of the original term, they could exercise an option to purchase the building for $265,000. The Taylors were not authorized to make improvements to the building without the consent of the lessor, though an exception was provided for certain improvements shown on an exhibit attached to and made a part of the lease. [1] It was also provided that, upon termination of the lease, the lessor could require that the lessees remove any leasehold improvements. Absent such election by the lessor, the improvements were to remain on the premises and would become the property of the lessor. IPI, as lessor, also retained the right to reasonably withhold consent to any transfer of David H. and Paula Taylor's interest in the property, although there were several specific subtenants named as exceptions to this provision. In the event of any assignment or sublease of the premises, the Taylors remained liable for all of their obligations under the lease. At the time the lease was executed, it was anticipated that the premises would be sublet to the *341 following entities: Michael Company (referred to by the parties and hereinafter as "Matrix Image"), Standard, Inter-America Products, Inc. (Inter-America), and Inter-Continental Motor Parts, Inc. The latter two entities were owned equally by Mr. Moss, Mr. Hertz, and David H. Taylor. The major sublessee, and the one for which almost all of the leasehold improvements were made, was Matrix Image. This entity was an equal partnership of David H. Taylor and his 23-year old son Richard, formed to assist Richard in working in his chosen field of video and sound production. To this end, extensive improvements were made to the approximately one-half of the building occupied by Matrix Image. These improvements included a vault designed for storing video film and video tape, a screening room, subsurface flooring, catwalks, extensive heavy-duty sophisticated electrical wiring, specialized plumbing, complete insulation of all spaces, heavy duty air conditioning equipment, sound-proof carpeting and walls, a 16-inch thick door, triple thick drywall and extra thick permanent wall partitions. Because of their specialized design, the leasehold improvements installed in the Matrix Image space were *342 not used nor usable by petitioner or the other subtenants. The total cost of improvements to the building was $262,000, almost all of which was attributable to the improvements installed in the space leased to Matrix Image. Despite this large outlay for the benefit of Matrix Image, no written sublease was executed between this partnership and David H. and Paula Taylor. It is stipulated that Matrix Image was obligated to pay $1,600 per month to Mr. and Mrs. Taylor, but it has not been shown that the sublease was anything more than a month-to-month tenancy. In contrast, Standard and the other sublessees executed detailed subleases binding them to rent their respective portions of the premises for the remaining term of the Taylors' lease from IPI (hereinafter the "master lease"). Standard's sublease was for the full five-year term of the master lease, with a total rental of $151,550, payable in variable monthly installments. Matrix Image proved to be an unsuccessful enterprise, and by December 31, 1973, it was conducting no business and had ceased making lease payments to David H. Taylor and his wife. At that point, David H. Taylor and the other shareholders of petitioner decided *343 to effect a sale to petitioner of all of David H. and Paula Taylor's interest in the building under the master lease from IPI. Such interest included the leasehold improvements, the subleases, and the option to purchase the building. In exchange, petitioner released David H. Taylor from an obligation to pay petitioner some $185,000 plus accrued interest, which amount he had borrowed to finance the leasehold improvements, and petitioner further agreed to satisfy David H. Taylor's obligation of about $53,000 to one of the building contractors. Petitioner was released from its sublease with the Taylors, and it assumed all of the Taylors' responsibilities under the master lease and the then existing subleases with Inter-America Products and an entity referred to in the agreement as "Innovative T.V.". Beginning in early 1974, petitioner attempted to sublease the portion of the building previously occupied by Matrix Image. At first, petitioner distributed some 1,600 brochures to prospective subtenants in the entertainment field, but when these efforts failed, an agent, Urban Industries, Inc., was hired on April 1, 1974. The agency agreement specified a rental of $5,500 per month, *344 which was approximately 31 cents per square foot for 17,500 square feet of space. This rental was more than triple the amount previously paid by Matrix Image, with the only difference being the addition of some unimproved warehouse space. Urban Industries, Inc., was unsuccessful in locating a sublessee, and on September 19, 1974, a second agent, Coldwell, Banker & Company (Coldwell), was retained. Although petitioner initially had attempted to sublease the Matrix Image space to persons in the entertainment field (including the video, recording, TV, and film making segments of that industry), at least by the time that Coldwell became involved, the search for potential sublessees was broadened to include manufacturing and commercial enterprises. However, the improvements were generally of little value to the latter, who were more interested in open spaces, and for whom many of the improvements were a negative factor. The contract with Coldwell was for the period from October 7, 1974, until February 1, 1975, and it was an exclusive leasing agreement for the entire building, with a specified monthly rental of 20.5 cents per square foot. This rental was insisted upon by David H. *345 Taylor, acting in his capacity as petitioner's president, despite the Coldwell agent's suggestion that the monthly rental be set at 18.5 cents per square foot. The agent thought that the building was both overimproved and overpriced for the general real estate market, and at the request of one prospective subtenant (not in the entertainment field) consideration was given to removing the leasehold improvements. This course of action was rejected, at least in part because petitioner did not have the funds required for the job. Coldwell agents showed the building to approximately 50 prospective subtenants between October 7, 1974, and February 1, 1975, but these efforts were of no avail. At that time, during the course of the 1974-1975 economic recession, petitioner's financial position was rapidly deteriorating as evidenced by a precipitous sales decline from some $6 million in the 1974 fiscal year to approximately $422,000 in fiscal 1975. On January 7, 1975, a special meeting of petitioner's board of directors was held. Minutes of the meeting, prepared by petitioner's secretary, Scott Taylor, disclose that the sale decline had created a cash flow problem, and that consideration *346 was given at the meeting to reducing petitioner's "overhead" expenses. In this connection, the minutes state: "Plans for relocation of office facilities should be explored even at the risk of abandoning the leasehold improvements. * * * Any results with the building sub-leasing through Coldwell Banker Agency will, of course, alter or accellerate [sic] actions to be taken". Soon thereafter, the board of directors decided to liquidate some equipment and inventory that remained in the building, and to this end an auction was held on February 21, 1975. [2] None of the leasehold improvements were sold at the auction. On March 21, 1975, another special meeting of petitioner's board of directors was held. According to the minutes of that meeting, the directors faced a serious problem *347 in meeting fixed expenses, particularly the obligation under the master lease with IPI, because petitioner had made "practically no sales" for the prior six months and had "minimal chances" for increased sales in the next three months. The minutes continue: It is therefore suggested and proposed that the Board of Directors consider moving to new quarters abandoning the present location and its facilities so as to reduce its overhead in these areas almost tenfold. This is essential for survival as we approach the final quarter of this disasterous [sic] year and hope for survival in the next year. If this can be achieved it will, of necessity, require the abandoning of any leasehold improvements made that exist with the property. This move is equated in purpose with the recent decision to liquidate all the inventory on hand and convert it to cash by an auction. This helped reduce our debt and interest with our important guarantor, Walter Heller Co. The main reason overall is to reduce the companies [sic] financial responsibilities and relieve its cash position flow. With the possibility that it will take at least another six (6) to eight (8) months to develop the contacts *348 and arrangements made recently in South America. It is imperative to take steps to insure survival by reducing expenditures during these next critical months. Losses which have occured in the past months and the loss that might result from abandoning the present lease and facilities will give Standard at least a fighting chance of survival. Federal Tax relief will be sought at the end of the fiscal year because of the severe economic reversals detailed herein and the corporation's need to abandon the leasehold improvements which it owns so as to reduce overhead. Although for economical reasons this year we have not had periodic accountant audited statements it would appear from the lack of sales and the increased loans and borrowing that losses at Standard will be considerable this year. The actual amount is yet to be determined. RESOLVED: That the corporation, being in serious financial difficulty, abandon its current premises at 6622 and 6636 Variel Avenue including the leasehold improvements attached thereto, and take all steps necessary to seek new quarters with as much speed and the least cost as possible. Further that David H. Taylor be informed of the decision to abandon *349 the premises and that no further rents shall be paid on the master lease to Industrial Park Inc. Further, that all rights and duties under said lease be reassigned to David H. Taylor including the option to purchase under said lease in exchange for a release of Standard Commodities obligations to David H. Taylor in an agreement dated February 27, 1974 to hold and save David H. Taylor harmless from any liability under sald lease. Said resolution was seconded and unanimously approved. No formal documents reflecting the reassignment of the master lease to David H. Taylor appear to have been executed. However, all the directors (including David H. Taylor) were present at the March 21, 1975, meeting, and the parties obviously regarded the reassignment as being immediately effective. Thus, only four day later on March 25, 1975, David H. Taylor, now acting in his individual capacity as lessee under the master lease as a result of the reassignment, entered into a new agency agreement with Coldwell. Under that agreement, Coldwell was to seek a sublessee for the entire building (25,700 square feet) at a monthly rental of 14.5 cents per square foot. In the alternative, Coldwell was authorized *350 to locate a purchaser for the building at the price of $425,000. Since the master lease was then in its fourth year, David H. Taylor had the option to purchase the building from IPI for $265,000. This purchase option had been reassigned to him as part of the transfer of petitioner's rights under the master lease pursuant to the March 21, 1975, resolution of petitioner's board of directors. On or about May 1, 1975, petitioner moved its offices, and some two weeks later David H. Taylor leased the entire building to Filmation Associates (Filmation), a film production company, which had been located by Coldwell, for a period of six months at a rental of $4,000 per month (15.6 cents per square foot). Filmation was given an option to extend the lease for six additional months, at a monthly rental of $5,250 (20.4 cents per square foot), as well as an option to purchase the building for $420,000. On August 15, 1975, David H. Taylor notified IPI that the option to purchase the building for $265,000 would be exercised. Filmation apparently decided to extend its sublease for six months, but the record does not show whether Filmation in fact exercised its option to purchase the building *351 from David H. Taylor. On its tax return for the period ended June 30, 1975, petitioner reported a net operating loss of $700,246, which included a claimed deduction of $229,150 under the heading "Loss on abandonment of leasehold improvements". This latter amount represented petitioner's claimed adjusted basis in the improvements. Petitioner also filed for, and was tentatively given, a refund of a portion of its fiscal 1973 Federal income taxes based on a carryback of the 1975 net operating loss. Subsequent to an audit of petitioner's 1975 return and disallowance of the abandonment loss, petitioner filed a "protest" of the disallowance in which the March 21, 1975, transaction between petitioner and David H. Taylor was described as follows: "In exchange for all of Standard's rights under the Lease (which, by that time, were of no value to Standard), Taylor released Standard of any liability under the Lease". In the statutory notice of deficiency, the Commissioner stated: [T]he loss of $229,150 claimed on the abandonment of leasehold improvements is not allowable because deductions for losses on sales or exchanges of property between an individual and a corporation more than *352 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual, are prohibited by Section 267 of the Internal Revenue Code. Due to the decrease in the net operating loss for the tax year ended June 30, 1975, the net operating loss deduction for the tax year ended June 30, 1973 is decreased accordingly. OPINION Section 165(a), I.R.C. 1954, provides generally for the deduction of an uncompensated loss sustained during the taxable year. A loss may result from the abandonment of property, Haspel v. Commissioner,62 T.C. 59, 71 (1974), affd. per order (8th Cir. 1975), and in the case of a depreciable asset, loss may be recognized even though no physical abandonment has occurred. Section 1.167(a)-8 (a)(3), Income Tax Regs. Nevertheless, the taxpayer must establish loss of useful value, and that the property was actually written off and abandoned. Burke v. Commissioner,32 T.C. 775, 780 (1959), affd. 283 F. 2d 487 (9th Cir. 1960). *353 The general rule was stated in Commissioner v. McCarthy,129 F. 2d 84, 87 (7th Cir. 1942): The rule to be deduced from the "abandonment" cases, we think, is that a deduction should be permitted where there is not merely a shrinkage of value, but instead, a complete elimination of all value, and the recognition by the owner that his property no longer has any utility or worth to him, by means of a specific act proving his abandonment of all interest in it, which act of abandonment must take place in the year in which the value has actually been extinguished. * * * Although petitioner contends that there was an abandonment here, it has been difficult to pin down its position as to exactly when and by what means it perceives such abandonment to have occurred. It finally, on brief, argues that the intention to abandon the leasehold improvements was formed "before the end of January, 1975", and that on or before February 22, 1975, there was an actual act of abandonment that was evidenced by locking the doors to that portion of the building where the leasehold improvements were situated; alternatively, petitioner contends that it permanently withdrew those improvements *354 by retiring them from use in its trade or business or in the production of income on or before February 22, 1975. Petitioner notes that abandonment was discussed at the January 7, 1975, special meeting of its board of directors, and asserts that by the end of January an affirmative decision to abandon the improvements had been made. As evidence of a decision to abandon the improvements, petitioner points to what it terms "the only clear physical act of abandonment available" -- locking the doors to the Matrix Image portion of the building after the auction of equipment and inventory in late February 1975. Thus, it is contended, the improvements had been abandoned well before the March 21, 1975, meeting at which it was resolved that "all rights and duties under said lease be reassigned to David H. Taylor", with the result that the improvements were not disposed of in a sale or exchange to which section 267, I.R.C. 1954, [3] would apply to deny the loss deduction. *355 The Government contests this analysis in several respects. First, the Government contends that the leasehold improvements had not lost their value during the year in question. It argues that petitioner's inability to sublease the improved portion of the building was a function not of the absence of value of the improvements, but rather of the unrealistically high rental sought by petitioner. Second, the Government questions the sufficiency of the evidence presented in respect of both petitioner's intent to abandon the improvements and the requisite act of abandonment. While it agrees that petitioner need not have demolished the improvements in order to establish a loss, the Government does contend that the actions of petitioner and the minutes of its board of directors' meetings fall short of demonstrating that an abandonment had in fact occurred prior to the March 21, 1975, meeting at which it was resolved to reassign petitioner's leasehold interest to David H. Taylor. Finally, the Government views the reassignment as a sale or exchange between petitioner and David H. Taylor, with the result that the loss deduction for the improvements is precluded by section 267. It should *356 be noted that petitioner does not dispute that the Taylor family's stock ownership on March 21, 1975, was sufficient to render section 267 applicable if in fact the leasehold improvements were disposed of in such a sale or exchange. We hold that petitioner has failed to establish that the leasehold improvements were abandoned prior to the March 21, 1975, meeting of petitioner's board of directors, [4] and we find that the remainder of petitioner's interest in the leasehold, including the improvements, was transferred at that time to David H. Taylor. We hold further that the transfer was part of a sale or exchange within the meaning of section 267(a), and thus petitioner may not deduct its loss on the disposition of the leasehold improvements. 1. Abandonment. For about a year petitioner had *357 made unsuccessful attempts to lease the Matrix Image portion of the building. At first such attempts were directed to potential lessees in the entertainment field that might find the leasehold improvements useful in their business. Later, such attempts were expanded to include many in the commercial or industrial fields whose requirements often called for more open space and for whom the improvements might be a negative factor. At the same time petitioner was experiencing serious financial difficulties in its own business, and it viewed its lease payments to IPI as perhaps its most troubling expense. With the sharp decline in its own business, it did not need the amount of space that it was then occupying. It was in this context that consideration was given at the meeting of petitioner's board of directors on January 7, 1975, to moving its offices to a smaller facility, "even at the risk of abandoning the leasehold improvements". The minutes note, however, that any action to be taken in this respect would be altered if Coldwell obtained a subtenant, thereby converting a burdensome liability into a productive asset. To the extent that the director's discussion at the January 7, 1975, meeting *358 relates to vacating the building and abandoning the leasehold improvements, it is clearly prospective in tone, without any hint of definite plans or an impending decision to make any such move. Moreover, it seems clear to us that "abandonment" was referred to only in the context of and as part of a possible relocation of its business to more modest quarters. We are not convinced by the evidence that any firm decision was taken "before the end of January" to abandon the leasehold improvements. Nor do we believe that any such abandonment in fact took place in late February, or that any "abandonment" of leasehold improvements was ever contemplated apart from moving away from the leased premises. It is true that in late February some remaining inventory and Matrix Image equipment (but not any leasehold improvements) were sold at auction. Petitioner attempts to make much of the fact that after the auction the doors to the Matrix Image portion of the building were locked, arguing that the "actual act of abandonment was evidenced by locking the doors to that portion of" the building. We do not attach much significance to the act of locking the doors. The evidence shows that the doors *359 had previously been locked from time to time. And we are by no means satisfied by the testimony of one witness that other representatives of petitioner did not from time to time thereafter unlock the doors and reenter the portion of the building in question. [5] For aught that convincingly appears, the locking of the doors, while apparently retaining the key, may have been nothing more than a prudent effort to guard against vandalism. Further, there is no indication that the building, together with the improvements, was thereafter unavailable for rental, although the agency agreement with Coldwell had expired on February 1. Moreover, even if the directors viewed the locked doors as a symbol of abandonment, the law requires more substantial evidence that the corporation's dominion over the assets has irrevocably terminated. Simple nonuse of the property is not sufficient. Seaboard Coast Line Ry. Co. v. Commissioner,72 T.C. 855, 895 (1979), affd. 642 F. 2d 1211 (5th Cir. 1981). The applicable requirement was stated in Citizens Bank of Weston v. Commissioner,252 F. 2d 425, 428 (4th Cir. 1958), *360 as follows: Normally, the loss involved in impaired usefulness is recognized on sale or other disposition. It may also be recognized as deductible when an event has definitely set at rest the possibility of future use. * * * But where * * * the possibility is not remote that the owner will alter its decision not to use a portion of the property for a particular purpose, no deduction is allowable. Petitioner has failed to meet this test. Our conclusion that no abandonment occurred prior to the March 21, 1975, board of directors' meeting is buttressed by the minutes of that meeting. They state that it was "suggested and proposed" that *361 the directors "consider * * * abandoning the present location", that such a move "will * * * require the abandoning of any leasehold improvements" (emphasis supplied), and that "the loss that might result from abandoning the present lease and facilities will give Standard at least a fighting chance of survival". This language speaks of a future event, and it is wholly incompatible with petitioner's suggestion that these minutes simply chronicle a completed act. We are not convinced that at any time prior to March 21, 1975, an event had "definitely set at rest the possibility of future use" of the improvements by petitioner, Citizens Bank of Weston v. Commissioner,supra.[6]
*362 Contrary to petitioner's repeatedly urged contention, we do not find that the minutes of the March 21, 1975, meeting of the board of directors merely "memorialized" a prior abandonment. No such abandonment had in fact occurred. That meeting, attended by David H. Taylor, provided that "all rights and duties under the lease be reassigned" to him. And although there appeared to be no further documentation of such reassignment, we are satisfied that there was then and there a shift of all rights and responsibilities under the master lease back to David H. Taylor, the principal officer and stockholder of petitioner as well as the lessee under the master lease. In only four days thereafter he entered into a new arrangement with Coldwell for subleasing the property, and in less than two months thereafter he was able to sublease the premises (including the leasehold improvements) to Filmation, a film production company, which obviously must have regarded at least some of the improvements as useful to it in committing itself to the sublease. We do not find in the context of this case that petitioner had abandoned the improvements as worthless. It simply transferred its interest in them *363 along with all other rights under the lease to David H. Taylor. 2. Sale or Exchange. Petitioner contends that the March 21, 1975, transfer of its leasehold interest was not part of a "sale or exchange" between itself and David H. Taylor, and that section 267(a) is therefore inapplicable. In essence, it is petitioner's position that the transfer was without consideration, in view of petitioner's alleged inability to meet its financial commitments and the claimed worthlessness of the improvements, and that in the absence of consideration there cannot be a "sale or exchange". [7]
*364 We reject the contention that the March 21, 1975, mutual transfers of rights and obligations between petitioner and David H. Taylor were without consideration. [8] Pursuant to the December 31, 1973, agreement by which petitioner first obtained its interest in the leasehold improvements, petitioner assumed all rights and obligations of David H. Taylor as both lessee under the master lease and sublessor of Inter-America and Innovative T.V. The rights obtained by petitioner included the improvements [9] and the option to purchase the building, while the primary obligation was for payment of the rental due under the master lease. *365 Pursuant to the resolution adopted at the March 21, 1975, meeting, petitioner returned to David H. Taylor all of its interest under the lease "in exchange for a release of Standard Commodities obligations to David H. Taylor * * * to hold and save David H. Taylor harmless from any liability under said lease". Petitioner was thus excused from its liability for the remaining rental payments to IPI, and it has not been shown that petitioner could not have made any or all of these payments. While it is true that petitioner was experiencing serious financial difficulties at the time, we note that petitioner had historically been a successful enterprise and the record does not convincingly show that its problems in 1975 were not due in large part to cyclical economic conditions. Cf. Boynton v. Commissioner,72 T.C. 1147, 1161 n. 16 (1979), affd. 649 F. 2d 1168 (5th Cir. 1981), cert. denied     U.S.     (Jan. 11, 1982). In fact the record does show that petitioner regained its economic health within a relatively short time after this crisis period and ultimately attained a profitable level of sales that appears to have surpassed that which it had *366 enjoyed in earlier prosperous times. We do not doubt that petitioner's directors viewed the elimination of this liability as imperative to the long-term viability of the enterprise, but we are unconvinced that on March 21, 1975, petitioner's financial condition was so poor that the commitment to make these payments was without value. Therefore, the release from David H. Taylor, which we are satisfied must at least be implied in the circumstances, [10] was a valuable consideration passing to petitioner. On the other side of the transaction, there can be little doubt that David H. Taylor received consideration from petitioner. Even if we accept arguendo petitioner's contention that the leasehold improvements were without value, or only of minimal value, David H. Taylor *367 still received all of the other rights as lessee under the master lease, including the purchase option, and the rights as sublessor of Inter-America and Innovative T.V. [11] There is nothing in the record to indicate that all of these rights were without value; in particular, we note that the purchase option was later exercised by David H. Taylor for $265,000 at a time when his sublessee, Filmation, had an option to purchase the building from him for $420,000. Petitioner's position that these mutual transfers did not constitute an "exchange" is further undercut by its own characterization of the transaction. As shown above, the minutes of the March 21, 1975, meeting refer to a reassignment of petitioner's rights *368 under the master lease "in exchange for" a release from David H. Taylor. Moreover, petitioner's protest letter to the district director describes the release from David H. Taylor as being part of an "exchange" for "Standard's rights under the Lease". Despite this earlier depiction of the facts, upon which is based the statutory notice denying the deduction under section 267, petitioner would have us hold that no exchange occurred and that section 267 does not apply. We find, however, that an exchange is precisely what occurred here, thus bringing this transaction within section 267. The Commissioner's determination must be sustained. [12]
Decision will be entered under Rule 155.
Footnotes
1. It would appear that the leasehold improvements shown on the exhibit are the ones at issue here.↩
2. Although the inventory referred to apparently belonged to Standard, the ownership of the equipment is less than clear. It appears that the equipment, which had been purchased and used by Matrix Image, was simply left in the building when Matrix Image ceased operations. It is also unclear to whom the proceeds of the auction were distributed, particularly in respect of the Matrix Image equipment.↩
3. SEC. 267. LOSSES, EXPENSES, AND INTEREST WITH RESPECT TO TRANSACTIONS BETWEEN RELATED TAXPAYERS. (a) Deductions Disallowed.--No deduction shall be allowed-- (1) Losses.--In respect of losses from sales or exchanges of property * * * directly or indirectly, between persons specified within any one of the paragraphs of subsection (b). (b) Relationships.--The persons referred to in subsection (a) are: (1) Members of a family, as defined in subsection (c)(4); (c) Constructive Ownership of Stock.--For purposes of determining, in applying subsection (b), the ownership of stock-- (2) An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family; (4) The family of an individual shall include only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants * * *.↩
4. Because no abandonment has been established, we need not decide whether the leasehold improvements retained any useful value. However, the fact that they had at least some value is strongly suggested by the subsequent rental of the premises to Filmation, which appears to have been engaged in the kind of business that could find at least some of the improvements to be of value.↩
5. That witness was Scott Taylor, David H. Taylor's older son, who was secretary of the corporation, but did not appear to be involved in the daily operations of petitioner. He was a lawyer, whose offices were at an entirely different location, and there is no evidence that he was physically present at the leased building other than on infrequent occasions so as to be in a position to know whether the premises were reentered after the auction.↩
6. Similarly, we find no valid basis for petitioner's alternative contention that it had permanently withdrawn the improvements by retirement from use in its trade or business or in the production of income on or before February 22, 1975. The improvements never were a part of petitioner's ordinary business of importing and selling various products. They were held by it as a business asset only in the sense that they were part of the former Matrix Image space that petitioner was attempting to sublease. And we are not convinced that petitioner had definitely abandoned its intention to obtain a sublessee for these premises as improved (cf. p. 20, supra↩) prior to March 21, 1975, when it reassigned all rights under the master lease to David H. Taylor.
7. Petitioner also contends that no sale or exchange occurs when payments are received in respect of a cancellation of a lease. We find such an argument inapposite, for there was no lease between petitioner and David H. Taylor after December 31, 1973. Petitioner additionally finds support for its position (that no sale or exchange occurred) in Rev. Rul. 75-527, 1975-2 C.B. 30↩, which holds that the relinquishment of simple contractual rights does not give rise to a capital transaction. That ruling is distinguishable, however, because the contract right therein was extinguished, rather than passing to the other party, as opposed to the improvements, purchase option, and sublessor rights, all of which passed to David H. Taylor.
8. Because of this holding, we are not faced with the issue of whether consideration is required for a sale or exchange under sec. 267(a). Cf. Freeland v. Commissioner,74 T.C. 970, 980-981↩ (1980). 9. In using the word "improvements" here, as well as elsewhere in this opinion, we do not mean to refer to an indefeasible fee simple ownership of the improvements. Upon termination of the master lease the original lessor had reversionary rights in the improvements. To the extent that reference is made to ownership of the improvements either by petitioner or David H. Taylor, such reference is intended to relate to their respective interests therein as lessee or sublessee.↩
10. David H. Taylor was the principal stockholder and dominant officer of petitioner. In view of his presence at the meeting and his history of dealing with the corporation as both a director and an independent individual, we think that those present at the meeting attached little significance to the lack of a written release from him, and we likewise find this fact to be of relatively little significance.↩
11. The record is not clear as to the status of these two entities in March of 1975. On May 1, 1975, David H. Taylor rented the entire building to Filmation, so at least by then Inter-America and Innovative T.V. had either ceased operations or moved. Nevertheless, we have no reason to believe that on March 21, 1975, these subleases were not in full force and effect, so the rights and obligations attendant to the sublessor were part of the transfer to David H. Taylor.↩
12. Pursuant to stipulation of the parties, petitioner is entitled to depreciation on the leasehold improvements for the period from July 1, 1974, to March 21, 1975. Moreover, in view of our disposition herein, we need not consider issues raised by petitioner in respect of a claim for refund and interest on such refund, since, in accordance with the stipulation of the parties, such issues must be addressed only if the principal issue is decided in petitioner's favor.↩